## Blackwell v. Eskin

C.P. of Philadelphia County, November Term 2003, no. 02098.

*David Adam Yanoff* and *James E. Beasley Jr.,* for plaintiff.

*Amy B. Ginensky, Robert C. Heim* and *Kristin Hynd Jones,* for defendants.

RAU, *J.,* March 14, 2006—

## I. INTRODUCTION

On March 8, 2003, Temple University suspended plaintiff Nathaniel Blackwell, a Temple assistant coach and former celebrity basketball player, for "violating team rules" after he missed a game. Officer Charles Campbell, a Temple police officer who had been assigned to the men's basketball team, had over a course of months reported to Mr. Eskin that there was more to the Mr. Blackwell story. According to Officer Campbell, Mr. Blackwell had an addiction to illegal drugs, Temple knew about Mr. Blackwell's drug problem and Mr. Blackwell had been involved in a theft problem in the Temple locker room the year before[1] (theft statement). On March 9,

---

1. Mr. Eskin's allegedly defamatory statement about Mr. Blackwell was: "But things got so bad Blackwell was involved in a theft problem last year in the team's locker room." (Def.'s exhibits to their mot. for summ. j. at exhibit I, "pl.'s civil action comp." at ¶¶30 and 31.)

2003, Mr. Eskin, believing that it was a matter of public concern that an assistant coach working with college athletes was using illegal drugs, broadcast a report on WCAU-TV that revealed the information he received from Officer Campbell.

Mr. Blackwell admits that the majority of the information in Mr. Eskin's broadcast was true, including that he was abusing cocaine, and he does not challenge any of the statements about drug use. (Pl.'s mem. of law in opp'n to def.'s mot. for summ. j. at 3.) Nevertheless, Mr. Blackwell filed this suit alleging that Mr. Eskin's theft statement defamed him, placed him in a false light and interfered with his prospective contractual relations. Mr. Blackwell, a public figure, must demonstrate by clear and convincing evidence that Mr. Eskin made the statement with "actual malice" to be liable for defamation and false light invasion of privacy. See *New York Times v. Sullivan,* 376 U.S. 254 (1964); *Tucker v. Philadelphia Daily News,* 577 Pa. 598, 848 A.2d 113 (2004). Mr. Blackwell failed to produce evidence showing that Mr. Eskin knew the report from the Temple police officer about Mr. Blackwell's drug use leading to his being involved in locker room thefts was false or that it was probably false. *New York Times,* 376 U.S. 254.

This court properly granted summary judgment on the defamation and false light claims in accord with constitutional decisions by the United States Supreme Court and the Pennsylvania courts applying the actual malice requirement. Likewise, plaintiff failed to produce evidence of a contract that was compromised by defendant's broadcast or any actual damages, making summary judgment appropriate on that claim.

## II. FACTUAL BACKGROUND

### A. *Plaintiff Blackwell Is a Public Figure*

Plaintiff Nathaniel Blackwell is a celebrity. Mr. Blackwell was a basketball star at Temple University in Philadelphia in the 1980s, leading Temple's team in four NCAA tournaments, three Atlantic Ten Conference titles and two Atlantic Ten Conference tournament championships. (Def.'s exhibits to their mot. for summ. j. at exhibit A, "Blackwell resume.") While leading his team to success at the national college level, Mr. Blackwell earned numerous individual awards including being inducted into the Big Five Hall of Fame and named Atlantic Ten Conference Player of the Year. *Id.* Mr. Blackwell played in the NBA for two years, first with the San Antonio Spurs and then with the Golden State Warriors. *Id.*

In the early 1990s, Mr. Blackwell held several coaching positions at Temple and Coppin State College in Baltimore. *Id.* In 1996, Mr. Blackwell returned as an assistant coach to the Temple University Men's Basketball Team. Mr. Blackwell was promoted in 1999 to first assistant underneath Coach John Chaney. (*Id.;* def.'s exhibits to their mot. for summ. j. at Blackwell dep. tr. at 462.)

Mr. Blackwell's duties as first assistant basketball coach included working closely with players at practices and games, monitoring players' academic performance and ensuring compliance with NCAA rules. (Def.'s exhibits to their mot. for summ. j. at Blackwell dep. tr. at 462-63; *id.* at exhibit B, "First Assistant job description.") Mr. Blackwell's responsibilities involved making public appearances on behalf of Coach Chaney and the team

to the media and at fundraisers. (Def.'s exhibits to their mot. for summ. j. at Blackwell dep. tr. at 460-64; *id.* Chaney dep. tr. at 45-47.) Mr. Blackwell has conceded that "as a collegiate and professional basketball player, and later as a collegiate assistant coach, he appeared on [television and radio] broadcasts, too many to recall." (Def.'s exhibits to their mot. for summ. j. at exhibit C, "pl.'s ans. to interrogs." at ¶40.) Plaintiff has not disputed that he is a public figure and admits that he is viewed as a "celebrity." (Pl.'s mem. of law in supp. of his opp'n to def.'s mot. for summ. j. at 22; def.'s exhibits to their mot. for summ. j. at Blackwell dep. tr. at 344.)

### B. *Plaintiff Blackwell Has a History of Illegal Drug Use*

Mr. Blackwell first tried cocaine at age 17. (Def.'s exhibits to their mot. for summ. j. at Blackwell dep. tr. at 215.) He used it sporadically while in the NBA, and became addicted in 1996 while coaching at Temple. (*Id.* at 222-26.) During 2001-2002, Mr. Blackwell admits that he was using cocaine daily, spending up to $60 a day on the illegal drug. (*Id.* at 65, 134-35, 234.) Mr. Blackwell testified that he became a "binge" cocaine user during this period, staying high for a couple of days with some binges costing up to $150. (*Id.* at 85-86, 91-92, 165, 242-44.) He would check into a hotel during some of these binges. (*Id.* at 91-92, 164-65, 242-45.) In 2002, in the middle of the Temple basketball season, Mr. Blackwell checked into a rehabilitation facility for two weeks but told Coach Chaney he needed to take the absence to deal with family problems. (*Id.* at 66, 257-60.) Mr. Blackwell's illegal use of cocaine continued into 2003. (*Id.* at 357.)

## C. *Temple Police Officer Discloses Plaintiff Blackwell's Drug Problem to Defendant Eskin*

Officer Charles Campbell was a Temple Police Officer on Temple's police force for nearly 30 years and was assigned for several years, including 2002, to Temple University's men's basketball team. (Def.'s exhibits to their mot. for summ. j. at Bergman dep. tr. at 25-27; def.'s exhibits to their mot. for summ. j. at exhibit E, "Campbell aff." at ¶2.) His duties included guarding Coach Chaney and the bench during games, and escorting Coach Chaney to and from the stadium and the locker room when there were games. (Def.'s exhibits to their mot. for summ. j. at Bergman dep. tr. at 31-32.) As a Temple University officer, his duties also included patrolling the campus and reporting crimes to the investigative unit, including theft. Officer Campbell had access to the results of those investigations. (*Id.* at 26-29.) There has been no evidence presented to suggest that Eskin knew[2] of any reason to question Officer Campbell's credibility or reliability.

---

2. Plaintiff claims that Officer Campbell was a "disturbed . . . security guard," (Pl.'s mem. of law in opp'n to def.'s mot. for summ. j. at 2.) Officer Campbell was not a security guard but a sworn municipal police officer who had attended a police academy before joining the Temple police force. Plaintiff claims Officer Campbell was "disturbed" because he was suspended on October 9, 2002 for verbally expressing his anger toward two fellow officers over not being informed of his son's arrest. (Pl.'s mem. of law in opp'n to def.'s mot. for summ. j. at exhibit F, Bergman dep. tr. at 6-10.) William Bergman, Temple's Vice President for Operations (which includes directing public safety), testified that Coach Chaney contacted him after the incident and requested that Officer Campbell be given another chance. Mr. Bergman testified that he believed Campbell to be of "sound mind" and allowed him to return to work about three months after the incident. (Def.'s reply to pl.'s resp. to def.'s mot. for summ. j. at exhibit 3, Bergman dep. tr. at

During the period of Officer Campbell's assignment to the Temple men's basketball team, he learned of Mr. Blackwell's drug problem. (Def.'s exhibits to their mot. for summ. j. at exhibit E, "Campbell aff." at ¶¶1 and 2.) Officer Campbell also came to know local sportscaster Howard Eskin. (*Id.* at ¶4.) Officer Campbell informed Mr. Eskin about Mr. Blackwell's drug problem and reported that "the problem had got so bad" that Mr. Blackwell had been involved in a theft in the locker room the year before. (Def.'s exhibits to their mot. for summ. j. at exhibit E, "Campbell aff." at ¶4.) Officer Campbell stated that he told Mr. Eskin this because he believed that Mr. Blackwell's use of illegal drugs made him a poor role model for the college students and he was concerned that Temple was not addressing Mr. Blackwell's drug problem. (Def.'s exhibits to their mot. for summ. j. at exhibit E, Campbell aff. at ¶¶4 and 5.) Officer Campbell hoped that Mr. Eskin would disclose the information publicly. (*Id.* at ¶¶4 and 5.)

Mr. Eskin testified that he had between five and 10 conversations with Officer Campbell about Mr. Blackwell's drug problem. Mr. Eskin believed Officer Campbell to be a reliable source as a Temple police of-

---

40-41.) In late January of 2003, Officer Campbell left work due to a wrist injury and in April 2003 (weeks after the broadcast at issue in this) Temple urged him to return to work. (Def.'s reply to pl.'s mem. of law in opp'n to def.'s mot. for summ. j. at exhibit 5, "conclusions of law" at ¶6.) Additionally, much of the other personal information that plaintiff recounts about Officer Campbell occurred after Mr. Eskin's broadcast. All of this information about Officer Campbell is wholly irrelevant in the absence of evidence that Mr. Eskin knew of Officer Campbell's suspension or believed that his reliability and credibility were at all impaired.

ficer[3] and stated that he "always believed Charlie Campbell to be trustworthy and honest in every conversation that [Eskin] had with him." (Def.'s exhibits to their mot. for summ. j. at Eskin dep. tr. at 35, 57.) With respect to the alleged theft, Mr. Eskin said that "it was clear that he [Officer Campbell] had knowledge of what was going on." (*Id.* at 57-58.) Mr. Eskin testified that he believed that Mr. Blackwell's drug abuse led to the theft because many drug abusers need money to support their habit. (*Id.* at 49-50.)

In addition, Mr. Eskin spoke to Temple Athletic Director Bill Bradshaw in September of 2002 about Mr. Blackwell's drug problem. (Def.'s exhibits to their mot. for summ. j. at Eskin dep. tr. at 42-45.) Mr. Bradshaw testified that he told Mr. Eskin that he had just taken the position, the conversation was in a public place and he did not respond to Mr. Eskin's comment about Mr. Blackwell's drug use. However, Mr. Bradshaw did not tell Mr. Eskin that the drug allegations were false. (Def.'s exhibits to their mot. for summ. j. at Bradshaw dep. tr. at 12-17.)

## D. *Defendant Eskin Broadcasts Information He Learned From Officer Campbell*

On Thursday, March 6, 2003, Mr. Blackwell began a two- to three-day cocaine binge. (Def.'s exhibits to their mot. for summ. j. at Blackwell dep. tr. at 357.) During

---

3. Although Officer Campbell was on medical leave during this period because of an injured wrist, Temple requested and approved him to return to work in April 2003. (Def.'s reply to pl.'s mem. of law in opp'n to def.'s mot. for summ. j. at exhibit 5, "findings of fact" at ¶18.)

that period he missed the Temple Men's basketball team's game against LaSalle and the team's weekend games. (Def.'s exhibits to their mot. for summ. j. at Blackwell dep. tr. at 372-73.) On Saturday, March 8, 2003, Temple issued a press release announcing that it had suspended Mr. Blackwell indefinitely for violating team rules but made no mention that its suspension had anything to do with Mr. Blackwell's use of illegal drugs. (Def.'s exhibits to their mot. for summ. j. at exhibit F, "press release.") The suspension was reported by the *Philadelphia Inquirer,* a regional newspaper, on March 9, 2003. The media began to try to contact Mr. Blackwell after learning of his suspension, but his wife, Loretta Blackwell, received the calls because Mr. Blackwell did not return from his cocaine binge until early Sunday, March 9, 2003. (Def.'s exhibits to their mot. for summ. j. at exhibit G, "*Philadelphia Inquirer* article"; Def.'s exhibits to their mot. for summ. j. at Blackwell dep. tr. at 503-505.)

After Temple's press release and the *Philadelphia Inquirer's* report on Mr. Blackwell's suspension, Mr. Eskin was concerned that in suspending Mr. Blackwell, Temple University was still not telling the public the full story. (Def.'s exhibits to their mot. for summ. j. at Eskin dep. tr. at 35, 46, 79.) Mr. Eskin believed that Mr. Blackwell's role as an assistant coach for college basketball players and his simultaneous use of illegal drugs and allegedly being involved in a "theft problem" in the locker room was a matter of public concern. (*Id.* at 79-80.) Consequently, relying upon Officer Campbell's reports about Mr. Blackwell, Mr. Eskin reported the following on his sports show, "Eskin Inside," which aired

on WCAU-TV, Channel 10, on Sunday, March 9, 2003, at 11:35 p.m.:

"My next item is one that is really hard to tell. It involves a former local hero who is in real trouble. He currently is the assistant basketball coach at Temple. Nate Blackwell had some terrific playing days at Temple and at one time thought to be the successor to John Chaney, but now he is nowhere . . . literally.

"Blackwell was suspended on Saturday for violating team rules, but it is far worse than that. Blackwell has missed work most of the week, was nowhere to be found on Thursday night for the Owls game with LaSalle and, as of this morning, the people at Temple still don't know where Nate Blackwell is. And the problem—I'm told Nate Blackwell has a substance abuse problem. The sad part of this story is that Nate Blackwell has had a substance abuse problem for at least a year and Temple has been covering this up.

"Last year Temple told us Blackwell missed the Louisville game to take care of his kid. That was a cover-up. He went to rehab. The head coach John Chaney has saved Blackwell many times—going to the University president to save his job. **But things got so bad Blackwell was involved in a theft problem last year in the team's locker room.** Now these problems are not new. Temple has been covering up for Blackwell for a while and now it's likely that Nate Blackwell is done at Temple and it is really sad because if he did the right things he probably would have been the successor to John Chaney." (Pl.'s civil action compl. at ¶30 (allegedly defamatory statement in bold); def.'s exhibits to their mot. for summ. j. at Eskin dep. tr. at 17-19.)

To this day, Mr. Eskin believes that all of the statements he reported about Mr. Blackwell were true. (Def.'s exhibits to their mot. for summ. j. at Eskin dep. tr. at 14-15.) Mr. Blackwell readily admits to his long-term cocaine addiction and to his missing practices and games because of the drug problem, but he disputes one statement in the Eskin broadcast: the statement alleging that he was involved in a "theft problem . . . in the team's locker room." (Pl.'s mem. of law in opp'n to def.'s mot. for summ. j. at exhibit B, Blackwell dep. tr. at 539-40.)

## E. *Blackwell Resigns From Temple*

Sometime in March or April 2003, Mr. Blackwell resigned from his Temple coaching position and signed an agreement not to sue Temple University. (Def.'s mem. of law in supp. of their mot. for summ. j. at 13.) Using illegal drugs violates Temple's and the NCAA's rules. (Def.'s exhibits to their mot. for summ. j. at Blackwell dep. tr. at 262, 501; def.'s reply to pl.'s mem. of law in opp'n to def.'s mot. for summ. j. at exhibit 4, Englert dep. tr. at 26-28.) Richard Englert, Temple's deputy provost and dean, said that the school would not hire a cocaine addict to coach student athletes. (Def.'s reply to pl.'s mem. of law in opp'n to def.'s mot. for summ. j. at exhibit 4, Englert dep. tr. at 9, 27-29.) Since his resignation from Temple, Mr. Blackwell has continued to struggle with cocaine addiction and has been in and out of drug rehabilitation. (Def.'s exhibits to their mot. for summ. j. at Blackwell dep. tr. at 70-72, 415-16; def.'s mem. of law in supp. of their mot. for summ. j. at 13.) As recently as March 2005, Mr. Blackwell's binge use of cocaine led him to check into a drug rehabilitation facil-

ity. (Def.'s exhibits to their mot. for summ. j. at Blackwell dep. tr. at 415-16.) Mr. Blackwell briefly held a part-time position with the U.S. Postal Service. (Def.'s exhibits to their mot. for summ. j. at Blackwell dep. tr. at 444; def.'s mem. of law in supp. of their mot. for summ. j. at 13.) Mr. Blackwell provided no evidence that he has applied for any other coaching positions, including a position at Temple, after he resigned. (Def.'s exhibits to their mot. for summ. j. at Blackwell dep. tr. at 446, 450.) Mr. Blackwell provided no evidence of a prospective employer who would be willing to hire him notwithstanding his current cocaine addiction but who would not hire him because of the theft statement.

## III. PROCEDURAL HISTORY

In November 2003, Mr. Blackwell filed this complaint against Howard Eskin, WCAU-TV d/b/a 10 NBC, and a number of other NBC-related entities, alleging defamation, false light invasion of privacy, and interference with prospective economic advantage[4] and seeking punitive damages. Out of the entire broadcast, Mr. Blackwell challenges only the statement that he was involved in locker room "theft problems." Mr. Blackwell did not challenge any of the disclosures of his illegal drug use and instead has admitted his long-term struggles with cocaine addiction. (Pl.'s mem. of law in opp'n to def.'s mot. for summ. j. at 3; def.'s exhibits to their mot. for summ. j. at Blackwell dep. tr. at 222-26, 357.) After discovery was

---

4. While plaintiff has entitled Count III of his complaint "Interference with prospective economic advantage," as will be explained *infra,* this court believes that he intended to claim tortious interference with prospective contractual relations.

complete, defendants filed a motion for summary judgment as to all counts of plaintiff Blackwell's complaint. This court granted defendant's motion on defamation, false light invasion of privacy, and interference with prospective economic advantage claims since plaintiff failed to produce sufficient evidence of his claims. Plaintiff timely appealed.

## IV. LEGAL DISCUSSION

Under Pennsylvania Rule of Civil Procedure 1035.2(2), a defendant is entitled to summary judgment if:

"After the completion of discovery relevant to the motion, including the production of expert reports, an adverse party who will bear the burden of proof at trial has failed to produce evidence of facts essential to the cause of action or defense which in a jury trial would require the issues to be submitted to a jury." Pa.R.C.P. 1035.2(2).

This court granted summary judgment[5] because plaintiff Blackwell failed to produce evidence to sustain claims for defamation, false light invasion of privacy and interference with prospective contractual relations.

---

5. The court need not reach the issue of whether summary judgment is warranted for individual damages since it granted summary judgment on all of the claims for other reasons. A plaintiff seeking punitive damages in a defamation suit must prove that the defendant made the statements with "actual malice." *Gertz v. Robert Welch Inc.*, 418 U.S. 323, 349-50 (1974). Since plaintiff has provided no evidence of actual malice, punitive damages would be precluded by law on all claims. *Id.*

## A. Summary Judgment Is Particularly Appropriate in Claims Involving First Amendment Interests When Insufficient Evidence of Actual Malice Is Presented

Free speech and press are axiomatic to true democracy. So crucial are they to the structure of American government that our first constitutional amendment strictly protects them from being stifled even at the risk that some publications may be inaccurate. The First Amendment guarantees of free speech and press form the necessary backdrop upon which every defamation claim must be examined:

"[T]he stake of the people in public business and the conduct of public officials is so great that neither the defense of truth nor the standard of ordinary care would protect against self-censorship and thus adequately implement First Amendment policies. Neither lies nor false communications serve the ends of the First Amendment and no one suggests their desirability or further proliferation. But to insure the ascertainment and publication of the truth about public affairs, it is essential that the First Amendment protect some erroneous publications as well as the true ones." *St. Amant v. Thompson,* 390 U.S. 727, 731-32 (1968).

The Supreme Court warned that "erroneous statement is inevitable in free debate," and "it must be protected if the freedoms of expression are to have the breathing space that they need to survive." *New York Times v. Sullivan,* 376 U.S. 254, 271-72 (1964) (Brennan, J.). (internal citations and quotations omitted)

Accordingly, the First Amendment protections require that a public figure who brings a defamation action must

prove by clear and convincing evidence that the defendant made the statement with actual malice. *New York Times v. Sullivan,* 376 U.S. 254, 279-80 (1964) (public official); *Milkovich v. Lorain Journal Co.,* 497 U.S. 1, 14 (1990) (public figure); *St. Amant v. Thompson,* 390 U.S. 727, 731 (1968); *Tucker v. Philadelphia Daily News,* 577 Pa. 598, 624, 848 A.2d 113, 130 (2004) (public figure).

In first articulating the actual malice standard in *New York Times v. Sullivan,* the Supreme Court outlined the significance of free speech and press to the very fabric of our nation and culture:

"The constitutional safeguard, we have said, was fashioned to assure unfettered interchange of ideas for the bringing about of political and social changes desired by the people. The maintenance of the opportunity for free political discussion to the end that government may be responsive to the will of the people and that changes may be obtained by lawful means, an opportunity essential to the security of the Republic, is a fundamental principle of our constitutional system. It is a prized American privilege to speak one's mind, although not always with perfect good taste, on all public institutions, and this opportunity is to be afforded for vigorous advocacy no less than abstract discussion. The First Amendment, said Judge Learned Hand, 'presupposes that right conclusions are more likely to be gathered out of a multitude of tongues, than through any kind of authoritative selection. To many this is, and always will be, folly; but we have staked upon it our all.'" 376 U.S. 254, 269-70 (1964). (internal quotes and citations omitted)

The actual malice standard reflects "a profound national commitment to the principle that debate on public

issues should be uninhibited, robust, and wide-open, and that it may well include vehement, caustic, and sometimes unpleasantly sharp attacks . . . ." *Id.* at 270.

The question of whether a plaintiff has produced clear and convincing evidence of actual malice is initially a question of law:

"The question whether the evidence in the record in a defamation case is of the convincing clarity required to strip the utterance of First Amendment protection is not merely a question for the trier of fact. Judges, as expositors of the Constitution, must independently decide whether the evidence in the record is sufficient to cross the constitutional threshold that bars the entry of any judgment that is not supported by clear and convincing proof of 'actual malice.' " *Curran,* 376 Pa. Super. 508, 517, 546 A.2d 639, 644 (1988) (citing *Bose Corp. v. Consumers Union,* 466 U.S. 485, 104 S.Ct. 1949, 80 L.Ed.2d 502 (1984)). Given that free speech and press might be hindered by people fighting meritless lawsuits and open public debate consequently self-censored, summary judgment is encouraged when a plaintiff has failed to provide the requisite evidence of defamation. *First Lehigh Bank v. Cowen,* 700 A.2d 498, 502 (Pa. Super. 1997).

### B. *Mr. Blackwell Did Not Produce Any Evidence That Mr. Eskin Acted With Actual Malice Warranting Summary Judgment on the Defamation Claim*

There are elements to plaintiff's defamation claim that the parties in this case dispute,[6] however, this court

---

6. To sustain a defamation claim, plaintiff has the burden of proving that the offending statement was false. *Hepps v. Philadelphia News-*

granted defendants' summary judgment motion because Mr. Blackwell failed to produce any evidence, much less clear and convincing evidence, that Mr. Eskin made the theft statement with actual malice.

Mr. Blackwell admits he is a public figure. (Pl.'s mem. of law in opp'n to def.'s mot. for summ. j. at 22.) A celebrity college coach's use of illegal drugs when he is charged with guiding student-athletes' participation in national collegiate competition, his alleged theft from his student players and the possibility that the University might be covering these problems up, invoked the constitutional requirement of proving the speaker acted with actual malice. *New York Times v. Sullivan,* 376 U.S. 254 (1964). The regional media paid considerable attention to Mr. Blackwell's unexplained absence from the premier team's games and his suspension for "violating team rules." However, there were unanswered questions about this public figure and this issue of public concern. Plaintiff does not dispute that he is required to demonstrate clear and convincing evidence that Mr. Eskin acted with actual malice.

The United States Supreme Court has placed "severe restrictions on a public figure-plaintiff's rights to recover in defamation." *Norton v. Glenn,* 580 Pa. 212, 860 A.2d 48, 54 (2004). It has defined actual malice as a statement

---

*papers Inc.,* 506 Pa. 304, 485 A.2d 374 (1984). In this case, defendant Eskin maintains that the statement is true, whereas plaintiff Blackwell has presented some evidence that the statement might be false (*i.e.,* that Blackwell was never involved in a theft in the Temple men's basketball team's locker room). Thus, whether the theft statement is false is a disputed fact. Nevertheless, this court's grant of summary judgment was based on the absence of evidence of actual malice, not on the issue of whether the offending statement was in fact false.

made "with knowledge that it was false or with reckless disregard of whether it was false or not." *New York Times v. Sullivan,* 376 U.S. 254, 279-80 (1964). A statement is made with reckless disregard if the speaker makes it with a "high degree of awareness of . . . [its] probable falsity." *Garrison v. Louisiana,* 379 U.S. 64, 74 (1964). Actual malice is a fault standard, not a negligence standard, predicated on the need to protect public discourse from being muffled. *New York Times,* 376 U.S. at 288; *Tucker v. Philadelphia Daily News,* 577 Pa. 598, 625, 848 A.2d 113, 130 (2004). Furthermore, the defendant's motivation for making an alleged defamatory statement will not supplant the need to prove actual malice. "[T]he actual malice standard is not satisfied merely through a showing of ill will or 'malice' in the ordinary sense of the term . . . [nor] can the fact that the defendant published the defamatory material suffice to prove actual malice." *Harte-Hanks Communications Inc. v. Connaughton,* 491 U.S. 657, 667 (1989).

Examining the undisputed facts is necessary to evaluate whether Mr. Eskin acted with actual malice. As a sworn Temple police officer assigned to guard the coach and players, Officer Campbell had regular contact with the players and their coaches. Officer Campbell repeatedly mentioned Mr. Blackwell's drug abuse to Mr. Eskin. Officer Campbell's job responsibilities involved investigating or reporting crimes including theft. (Def.'s exhibits to their mot. for summ. j. at Bergman dep. tr. at 26-27.) Thus, when Officer Campbell told Mr. Eskin that Mr. Blackwell had been involved in a theft problem in the locker room, it was logical for Mr. Eskin to assume this information was learned in the course of Officer

Campbell's duties. (Def.'s exhibits to their mot. for summ. j. at exhibit E, "Officer Campbell affidavit" at ¶4.)

Other events seemed to corroborate what Officer Campbell told Mr. Eskin. When Mr. Eskin raised the drug problem issue with the Athletic Director, Bill Bradshaw, he was evasive and refused to answer but did not deny that Mr. Blackwell had a drug problem. (Def.'s exhibits to their mot. for summ. j. at Eskin dep. tr. at 42-43; def.'s exhibits to their mot. for summ. j. at Bradshaw dep. tr. 12-14, 16-17.) In the days preceding Mr. Eskin's broadcast, Mr. Blackwell inexplicably missed games. Temple University issued a press release stating that Mr. Blackwell was suspended for violating team rules. Temple seemed to be withholding some information, such as what "team rules" Mr. Blackwell had violated that would warrant publicly announcing an indefinite suspension. Mr. Blackwell was not even available to the press to comment on his suspension from the team.

Mr. Eskin's broadcast followed these events, which were consistent with, and certainly did not contradict, the information he received from Officer Campbell. There has been no evidence that Mr. Eskin knew, or even should have known, that Officer Campbell was unreliable. Similarly, there has been no evidence that Mr. Eskin had any vendetta against Mr. Blackwell.

Indeed, Mr. Blackwell concedes that the majority of Mr. Eskin's March 9, 2003 broadcast that was based on Officer Campbell's information was true. Mr. Blackwell admits that during the period of Mr. Eskin's broadcast, he was addicted to cocaine, using up to $60 in cocaine daily and regularly going on $150 cocaine binges while earning an associate coach's salary. Mr. Blackwell ad-

mits that his behavior was so out of control that he would miss games and stay in a hotel room for days at a time when he binged on cocaine. Mr. Blackwell also admits that his 2002 absence from work occurred because he entered a drug rehabilitation program. Mr. Blackwell concedes all of the criminal conduct involving buying and using drugs that Officer Campbell reported to Mr. Eskin, but alleges that Mr. Eskin acted with actual malice when he broadcast this statement: "But things got so bad Blackwell was involved in a theft problem last year in the team's locker room." (Pl.'s civil action compl. at ¶30.)

Plaintiff urges that any discussion of Mr. Blackwell's illegal drug use in the context of this summary judgment motion "is a desperate attempt to misguide" or "misdirect the focus" of the case. (Pl.'s mem. of law in opp'n to def.'s mot. for summ. j. at 4.) Plaintiff tries to separate the false theft allegation from the broader context of plaintiff's serious addiction to cocaine. A proper analysis of whether Mr. Eskin acted with actual malice requires the entire context of the situation to be analyzed. The Supreme Court has emphasized that in "determining whether the constitutional standard has been satisfied . . . the court must consider the factual record in full." *Harte-Hanks Communications Inc. v. Connaughton,* 491 U.S. 657, 688 (1989).

The report that Mr. Blackwell was allegedly involved in theft did not occur in isolation. The report was part of a larger story, that Mr. Blackwell was using cocaine to such a degree that he missed games and received an indefinite suspension from his job. Mr. Eskin testified that after hearing Officer Campbell's report of theft, he be-

lieved that Mr. Blackwell's illegal drug use had led to theft, since many drug users need money to support their expensive habit. (Pl.'s mem. of law in opp'n to def.'s mot. for summ. j. at exhibit E, Eskin dep. tr. at 49-50.) Certainly it does not strain credulity to think that an assistant coach who engages in an expensive and dangerous illegal drug habit and who was so out of control that he was missing public games and risking his job, might also engage in other illegal behavior like theft to support his cocaine habit. The criminal courts abound with cases of individuals who have taken this unfortunate path. The issue is not whether the statement was true but whether Mr. Eskin knew that the statement was false or probably false.

Plaintiff did not produce a single piece of evidence showing that Mr. Eskin knew the theft statement was false or that it was probably false. There has been no evidence that Mr. Eskin was aware that Officer Campbell's report might be inaccurate. To the contrary, Mr. Eskin's knowledge was that as a Temple police officer assigned to the team, Officer Campbell would be in a position to know the truth about thefts from the team locker room. Significantly, Mr. Blackwell admits the vast majority of what Officer Campbell reported to Mr. Eskin.

The United States Supreme Court has emphasized that the actual malice requirement is a subjective standard, not an objective standard. *Harte-Hanks Communications Inc. v. Connaughton,* 491 U.S. 657, 688 (1989). Thus, whether Mr. Eskin actually knew the broadcast was false or probably false is the issue to be addressed, not what some other person knew or what Mr. Eskin should have known. *Id.* In *St. Amant v. Thompson,* the Supreme Court

described the necessary evidence that a public figure defamation plaintiff must produce to prevail:

"[E]vidence of either deliberate falsification or reckless publication, despite the publisher's awareness of probable falsity, was essential to recovery by public officials in defamation actions. These cases are clear that reckless conduct is not measured by whether a reasonably prudent man would have published, or would have investigated before publishing. There must be sufficient evidence to permit the conclusion that the defendant in fact entertained serious doubts as to the truth of his publication. Publishing with such doubts shows reckless disregard for truth or falsity and demonstrates actual malice." 390 U.S. 727, 731.

Absent any direct evidence that Mr. Eskin knew the theft statement was false, plaintiff attacks Mr. Eskin's source. Ironically in this defamation case, plaintiff's counsel characterizes Officer Campbell as a "disturbed, suspended security guard." To the contrary, at the time of Mr. Eskin's reliance on Officer Campbell, he was a sworn Temple police officer who was on leave for his wrist injury, and who Temple approved to return on full duty shortly after the broadcast. Temple's placing Officer Campbell in a position of significant responsibility as a police officer entrusted with a weapon demonstrates that Temple did not view him as impaired.

Moreover, plaintiff has failed to provide any evidence, circumstantial or otherwise, to show that Mr. Eskin knew of Officer Campbell's prior suspension or believed his reliability and credibility were at all impaired. Plaintiff asserts that, "Eskin had to have obvious reasons to doubt his 'source's' veracity and the accuracy of his allegation

. . ." and then describes a litany of personal events[7] that occurred in Officer Campbell's life that allegedly make him an unreliable source. (Pl.'s mem. of law in opposition to def.'s mot. for summ. j. at 27, footnote 13.) (boldface and italics omitted from original) Plaintiff's emphasis on the phrase "had to" highlights the deficiency of his evidence. "Had to" is equivalent to saying "should have," which is an objective analysis using negligence principles. Constitutional protections require the focus to be on what Mr. Eskin subjectively knew rather than on an objective analysis of what he should have known. *Harte-Hanks Communications Inc.,* 491 U.S. at 688.

Mr. Blackwell presented no evidence showing that Mr. Eskin actually had any reasons to doubt Officer Campbell. Plaintiff did not show that anyone from Temple (or anywhere else) told Mr. Eskin not to trust Officer Campbell, or gave Mr. Eskin information that would lead him to distrust Officer Campbell. Instead, the only evidence is Mr. Eskin's statement that he considered Officer Campbell trustworthy, which was bolstered by his direct observations of Officer Campbell in his position as a Temple police officer assigned to the Temple men's basketball team.[8]

Lacking any direct evidence of actual malice, the thrust of plaintiff's argument is that Mr. Eskin was negligent

---

7. Some of the events plaintiff describes happened after Mr. Eskin's broadcast and are irrelevant to what Mr. Eskin knew when he made the broadcast.

8. Even from an objective analysis, this court fails to see how the knowledge that an individual who is a uniformed police officer is an "obvious reason" to doubt that individual's veracity about information that he would be likely to learn in the course of his duties.

by failing to adequately investigate the truth of the theft statement and for trusting a Temple police officer as his source. Both the United States Supreme Court and the Pennsylvania courts have consistently held that mere negligence or recklessness by the defendant reporter in investigating a story does not show actual malice.

"*Mere negligence or carelessness is not evidence of actual malice.* A defendant's failure to verify his facts may constitute negligence, but does not rise to the level of actual malice. That is, while it arguably may be negligent not to check independently the veracity of information before publication, this fault does not rise to the level of actual malice." *Reiter v. Manna,* 436 Pa. Super. 192, 197, 647 A.2d 562, 565 (1994) (internal citations and quotations omitted), quoting *Oweida v. Tribune-Review Publishing Company,* 410 Pa. Super. 112, 135-36, 599 A.2d 230, 242-43 (1991), *alloc. denied,* 529 Pa. 670, 605 A.2d 334 (1992). The U.S. Supreme Court has expressly rejected an actual malice standard predicated upon "a showing of highly unreasonable conduct constituting an extreme departure from the standards of investigation and reporting ordinarily adhered to by responsible publishers." *Harte-Hanks Communications Inc. v. Connaughton,* 491 U.S. 657, 666 (1989). (internal quotations and citations omitted)

Plaintiff relies on the following passage from *St. Amant v. Thompson,* in support of his claim that Mr. Eskin's reliance on Officer Campbell amounted to actual malice:

"The finder of fact must determine whether the publication was indeed made in good faith. Professions of good faith will be unlikely to prove persuasive, for example,

where a story is fabricated by the defendant, is the product of his imagination, or is based wholly on an unverified anonymous phone call. Nor will they be likely to prevail when the publisher's allegations are so inherently improbable that only a reckless man would put them into circulation. Likewise, recklessness may be found where there are obvious reasons to doubt the veracity of the informant or the accuracy of his reports." 390 U.S. at 732.

This passage actually illustrates why this court was compelled to grant summary judgment. No evidence was presented that Mr. Eskin fabricated the story, that an alleged theft in the context of out of control illegal drug use was "inherently improbable," or that there were any obvious reasons to doubt Officer Campbell's report. In sketching the outer reaches of constitutionally acceptable investigation, the *St. Amant* court gave a wide berth to a reporter's investigative practices.

Negligent reporting, while regrettable, does not amount to defamation. This is reflected by recent Pennsylvania case law. In *Tucker v. Philadelphia Daily News,* 577 Pa. 598, 848 A.2d 113 (2004), the public figure plaintiffs sued two newspaper companies for reporting that plaintiffs were seeking $10,000,000 in damages to their sex life in their lawsuit against members of the music industry. The plaintiffs argued that the newspapers failed to properly investigate the story or interview the best sources, ignored a press release by the plaintiffs and relied on a biased statement by an opposing attorney. The Pennsylvania Supreme Court held that such reporting, even if it was not ideal, failed to establish actual malice. 577 Pa. at 634-35, 848 A.2d at 135-36.

Plaintiff plays with semantics when referring to Officer Campbell as a "mere conduit" for a rumor and characterizing the ultimate source of the information as "anonymous." Mr. Eskin's subjective trust of a Temple police officer who he knew personally and whose job duties made it probable that he had a sound basis for the statement is wholly different than an anonymous telephone call. To require Mr. Eskin to delve into the ultimate origin of his source's information would require the kind of background investigation and fact checking that the courts have consistently rejected. Furthermore, Mr. Eskin's conversation with the director of Temple's athletic program, Bill Bradshaw, demonstrates that Mr. Eskin did not conduct his investigation so as to willfully or recklessly avoid the truth.

Plaintiff failed to meet the constitutional requirement of providing clear and convincing evidence that Mr. Eskin made the theft statement about Mr. Blackwell with actual malice. Defendants are entitled to summary judgment on plaintiff's defamation claim.

## C. *Defendants Are Entitled to Summary Judgment on Plaintiff's False Light Invasion of Privacy Claim Because Plaintiff Did Not Produce Evidence That Mr. Eskin Acted With Actual Malice*

Plaintiff Blackwell also made a false light invasion of privacy claim. The tort of false light invasion of privacy is based on "publicity that unreasonably places [the plaintiff] in a false light before the public," and involves a major misrepresentation of a person's activities, history or character that could reasonably be expected to seriously offend a reasonable person. *Strickland v. University of Scranton,* 700 A.2d 979, 987 (Pa. Super. 1997). (internal citations omitted)

Just as with claims for defamation, a false light invasion of privacy tort "incorporates the First Amendment's constitutional protections set forth in *New York Times Co. v. Sullivan,* 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964), and its progeny." *Seale v. Gramercy Pictures,* 964 F. Supp. 918, 924 (E.D. Pa. 1997). Consequently, to sustain a false light claim, "the person making the statement that is accused of rendering another in a false light must act with 'knowledge of or . . . in reckless disregard as to the falsity of the publicized matter and the false light in which the [plaintiff] would be placed.'" *Rush v. Philadelphia Newspapers Inc.,* 732 A.2d 648, 654 (Pa. Super. 1999) (quoting *Larsen v. Philadelphia Newspapers Inc.,* 375 Pa. Super. 66, 81, 543 A.2d 1181, 1188 (1988). Negligence alone is insufficient to state a false light claim. Thus, a public figure plaintiff must demonstrate clear and convincing evidence that the speaker acted with actual malice in making the offending statement. *Rush,* 732 A.2d 648.

As discussed above, Mr. Blackwell has failed to present any evidence showing that Mr. Eskin made the theft statement knowing that it was false or probably false, thereby entitling defendants to summary judgment on the false light invasion of privacy claim.

### D. *Defendants Are Entitled to Summary Judgment on Plaintiff's "Interference With Prospective Economic Advantage" Claim Where Plaintiff Produced No Evidence of a Prospective Contractual Relation*

Plaintiff articulates a claim for "interference with prospective economic advantage" but there is no such claim

under Pennsylvania law. After examining the text of Count III of plaintiff's complaint, as well as subsequent submissions by both parties, this court believes that plaintiff intended to claim "tortious interference with prospective contractual relations." The elements of this tort are:

"(1) a prospective contractual relation;

"(2) the purpose or intent to harm the plaintiff by preventing the relation from occurring;

"(3) the absence of privilege or justification on the part of the defendant; and

"(4) the occasioning of actual damage resulting from the defendant's conduct." *Thompson Coal Co. v. Pike Coal Co.,* 488 Pa. 198, 412 A.2d 466, 471 (1979).

While recognizing that a prospective contractual relation is "necessarily uncertain," the Pennsylvania Supreme Court has stated that though it might be "something less than a contractual right," it "must be more than a mere hope or the innate optimism of the salesman." *Id.* at 209, 412 A.2d at 471. A plaintiff must demonstrate that, "but for the wrongful acts of the defendant, it is reasonably probable" that the plaintiff would have entered into a contractual agreement. *Thompson,* at 209, 412 A.2d at 471. (internal citations and emphasis omitted)

When Mr. Eskin made the theft statement, Temple had already suspended Mr. Blackwell indefinitely for violating team rules. After the broadcast, Mr. Blackwell admitted to Temple and others that he had a serious addiction to cocaine. Mr. Blackwell resigned from Temple. His addiction has continued to the present and, since the broadcast, Mr. Blackwell has been in and out of drug rehabilitation. Within the last year, Mr. Blackwell's binge

cocaine use led him to check into a drug rehabilitation center. (Def.'s exhibits to their mot. for summ. j. at Blackwell dep. tr. at 415-16.)

In response to defendant's motion claiming that plaintiff had failed to produce sufficient evidence to sustain the claim, plaintiff produced opinion but no evidence. Mr. Blackwell has not produced any evidence of the existence of a prospective contractual relation between himself and a third party. Instead, he merely asserts that the theft statement has "severely compromised his very employability in his chosen profession." (Pl.'s mem. of law in opp'n to def.'s mot. for summ. j. at 39.) He also submits Coach Chaney's speculative opinion that a coach who admittedly used illegal drugs *previously* while coaching players would be employable but if that same coach was said to have stolen from players, even if the theft were not believed, he would not be employable as a coach. (Pl.'s mem. of law in opp'n to def.'s mot. for summ. j. at exhibit D, Chaney dep. tr. at 134-37.)

Significantly, Mr. Blackwell has provided no evidence of an employer, or even the opinion of an employer, who would be willing to hire him with his *current* addiction to cocaine but who would not do so because of the theft statement. Richard Englert, Temple's deputy provost and dean, has said that Temple would not hire a cocaine addict to coach student athletes. (Def.'s reply to pl.'s mem. of law in opp'n to def.'s mot. for summ. j. at exhibit 4, Englert dep. tr. at 9, 27-29.)

Mr. Blackwell has failed to provide a single piece of evidence that he has tried to apply for another coaching position at Temple or anywhere else. Mr. Blackwell has provided no job leads, applications or discussions that

he has had with prospective employers. Mr. Blackwell has also shown no evidence that the theft statement[9] rather than his cocaine addiction thwarted his employability. Mr. Blackwell has produced nothing more than a "mere hope" of a prospective contractual relation. Mr. Blackwell's difficult struggle to overcome his cocaine addiction has undoubtedly been the focus of his attention.

Plaintiff has shown neither a prospective contractual relation nor any actual damages that he has sustained, entitling defendants to summary judgment on this claim.

## V. CONCLUSION

For the above stated reasons, the Superior Court should affirm this court's grant of summary judgment on defamation, false light invasion of privacy and tortious interference with prospective contractual relations.

---

9. The theft statement was embedded within a longer statement regarding Mr. Blackwell's illegal drug use and how it interfered with his job performance as an assistant coach. Consequently, anyone who heard the theft statement would also be aware that Mr. Blackwell had a serious drug addiction that compromised his ability to coach. Any further checking of this information would confirm that the illegal drug use was accurate.