Harold L. RUSH and Dorothy Sumners Rush, Appellants

v.

PHILADELPHIA NEWSPAPERS, INC., and Zachary Stalberg Kevin Haney, Yvette Ousley and Cynthia Burton, Appellees.

Superior Court of Pennsylvania.

Submitted April 8, 1999.

Filed June 9, 1999.

Adrian J. Moody, Philadelphia, for appellants.

Amy B. Ginensky, Philadelphia, for appellees,

Before HUDOCK, EAKIN and MUSMANNO, JJ.

HUDOCK, J.:

¶ 1 Harold L. Rush and Dorothy Sumners Rush (the Rushes) appeal from the order that granted summary judgment to Philadelphia Newspapers, Inc., Zachary Stalberg, Kevin Haney, Yvette Ousley and Cynthia Burton (the newspaper) on the Rushes' complaint sounding in defamation and invasion of privacy (false light). We affirm.

¶ 2 The trial court summarized the pertinent facts of this case as follows:

The underlying action filed by the [Rushes] claimed that two separate articles written by and published by the [newspaper] defamed them and invaded their privacy by casting them in a false light. The [newspaper] filed preliminary objections to the complaint. On October 31, 1996, the Honorable Pamela P. Cohen granted the preliminary objections pertaining to the defamation count

in the complaint and dismissed those claims. The claims pertaining to invasion of privacy (false light) were permitted to remain. Extensive discovery has taken place and based upon the record and existing case law, the [newspaper has] moved for summary judgment on the basis that [the Rushes] cannot prove their claims as a matter of law.

[Appellant], Harold Rush, was the owner of T–Enta Corporation, a business which contracted with the School District of Philadelphia to provide vending services to schools. Plaintiff, Dorothy Rush, was a member of the School Board who was appointed after the vending contract was awarded to her husband's business. The record reveals that a large degree of controversy surrounded the awarding of the vending contract to Mr. Rush. In addition, the appointment of Mrs. Rush to the School Board came with its own questions, concerns and opposition. The record also reveals that prior to 1996, several articles were published by [the newspaper] which reported facts relating to both of the Rush's [sic] and their dealings with politicians, public figures, and business figures in Philadelphia. No lawsuits were ever brought regarding these articles. In February, 1996, [the newspaper] authored and published two articles relating to a speech given by the President of the Philadelphia School Board, Andrew Farnese. This speech focused on the elimination of "patronage" in the School District and Mr. Farnese's attempt to reduce District financial expenditures. The articles identified three individuals who maintained contracts with the District which may be targets in the contract review and revisions initiated by Mr. Farnese. The three individuals were identified as having been active in former Congressman Gray's political machine. Mr. Rush's company was one of the three individuals identified in the article. As a result of these two articles, [the Rushes] filed suit claiming that their privacy had been invaded by the [newspaper] who had cast them in a false light.

Trial Court Opinion, 11/9/98, at 1–2.

¶ 3 The Rushes raise the following issues on appeal:

1. THE NEWSPAPER ARTICLE WAS CAPABLE OF A DEFAMATORY MEANING

2. THE APPELLEES' ARTICLE CAST THE APPELLANTS IN A FALSE LIGHT

3. EVIDENCE EXISTED THAT THE APPELLEES ACTED NEGLIGENTLY

4. DISPUTED ISSUES OF FACT PRECLUDED SUMMARY JUDGMENT

Appellants' Brief at 3.

¶ 4 In reviewing the grant of summary judgment, we look to whether the trial court committed an error of law. *Panichelli v. Liberty Mut. Ins. Group*, 543 Pa. 114, 669 A.2d 930 (1996).

> Summary judgment may be granted only in cases where it is clear and free from doubt that there is no genuine issue as to any material fact and that the moving party is entitled to summary judgment as a matter of law. The moving party has the burden of proving the nonexistence of any genuine issue of material fact. The record must be viewed in the light most favorable to the non-moving party, and all doubts as to the existence of a genuine issue of material fact must be resolved against the moving party.

*Salazar v. Allstate Ins. Co.*, 549 Pa. 658, 662, 702 A.2d 1038, 1040 (1997); *see also Bethlehem Steel Corp. v. MATX Inc.*, 703 A.2d 39 (Pa.Super.1997). The entry of summary judgment is proper where the uncontraverted allegations in the pleadings, depositions, answers to interrogatories, admissions of record, and submitted affidavits demonstrate that no genuine issue of material fact exists and that the moving party is entitled to judgment as a

matter of law. *Knoud v. Galante*, 696 A.2d 854, 855 (Pa.Super.1997), *appeal denied*, 553 Pa. 707, 719 A.2d 747 (1998); *Phico Ins. Co. v. Presbyterian Med. Serv.*, 444 Pa.Super. 221, 663 A.2d 753, 755 (1995).

¶ 5 Initially, we address the newspaper's claim that the Rushes' first issue, regarding the defamation cause of action, is not properly before this Court because the trial court granted summary judgment on this claim on October 31, 1996, and no appeal was taken from that order. However, the October 31, 1996, order was not immediately appealable because it did not dispose of all claims or all parties to the action. This Court has stated:

> The time for filing [an] appeal is measured from the date an appealable order is entered. Under Pennsylvania law, an appeal may only be taken from an interlocutory order as of right (Pa.R.A.P. 311), from a final order (Pa.R.A.P.341), from a collateral order (Pa.R.A.P.313), or from an interlocutory order by permission (Pa.R.A.P. 313, 1311, 42 Pa. C.S.A. § 702(b)).

> \* \* \*

> [T]he partial grant of summary judgment only becomes final after entry of an order disposing of all claims or of all parties. Appeal must be taken within thirty days thereafter. *See [Bonner v.*

1. The newspaper also contends that the order granting summary judgment should be affirmed because the Rushes failed to adduce sufficient evidence of a genuine issue of material fact by not pointing to evidentiary support in the depositions or other evidence of record in opposition to the summary judgment motion. While we recognize that a party faced with a motion for summary judgment may not merely rest upon the mere allegations or denials of the pleadings in opposition to the motion, Pa.R.C.P. 1035.3(a), we decline to decide the present appeal on this basis. The Rushes' answer to the motion for summary judgment contains sufficient argument setting forth the Rushes' contentions regarding the genuine issues of material fact involved in this case, and these issues all pertain to the application of

*Fayne*, 441 Pa.Super. 432, 657 A.2d 1001 (1995) ]; Pa.R.A.P. 341.

*Smitley v. Holiday Rambler Corp.*, 707 A.2d 520, 523–24 (Pa.Super.1998) (some citations and quotation marks omitted; footnotes omitted). An order granting summary judgment on one cause of action but not all those contained in a complaint will not be immediately appealable absent the trial court's certification that an immediate appeal would facilitate resolution of the entire case. Pa.R.A.P. 341(c). We note that no such certification exists in this case. Under such circumstances, an appellant must wait to file his appeal until after an order disposing of all claims or all parties has been issued. The trial court entered a final order in the instant case on September 14, 1998, and the Rushes' appeal was filed in a timely fashion thereafter. Hence, the Rushes are not precluded by our Rules of Appellate Procedure from appealing the October 31, 1996, order at this time.[1]

¶ 6 The Rushes first contend that the newspaper article was capable of a defamatory meaning. This Court has stated the elements of a defamation action in the following manner:

> In an action for defamation, the plaintiff must prove: (1) the defamatory character of the communication; (2) publication by the defendant; (3) its application to the plaintiff; (4) understand-

the relevant law to the undisputed facts at hand. Dismissing the appeal on the basis advanced by the newspapers in this instance would be inappropriate.

In a similar vein, the newspaper has filed a motion with this Court seeking to dismiss this appeal due to the Rushes' failure to prepare and submit a Reproduced Record. Although there is some case support for the newspaper's position, this Court has also declined to dismiss an appeal on this basis in the interest of judicial fairness. *See, e.g., Helms v. Boyle*, 431 Pa.Super. 606, 637 A.2d 630 (1994). Because our review of the issues in this case is not hampered by the lack of a Reproduced Record, we likewise will deny the newspaper's motion in this case.

ing by the recipient of its defamatory meaning; (5) understanding by the recipient of it as intended to be applied to plaintiff; (6) special harm to the plaintiff; (7) abuse of a conditionally privileged occasion. Initially, it is the function of the court to determine whether the communication complained of is capable of a defamatory meaning. A communication is defamatory if it tends to harm the reputation of another as to lower him in the estimation of the community or to deter third persons from associating or dealing with him. A communication is also defamatory if it ascribes to another conduct, character or a condition that would adversely affect his fitness for the proper conduct of his proper business, trade or profession. If the court determines that the challenged publication is not capable of a defamatory meaning, there is no basis for the matter to proceed to trial; however, if there is an innocent interpretation and an alternate defamatory interpretation, the issue must proceed to the jury.

*Maier v. Maretti,* 448 Pa.Super. 276, 671 A.2d 701, 704 (1995) (citations omitted). Further, when determining whether a communication is defamatory, the court will consider what effect the statement would have on the minds of the average persons among whom the statement would circulate. *Id.* "The words must be given by judges and juries the same significance that other people are likely to attribute to them." *Id.*

■ ¶ 7 The present case concerns two newspaper articles, the first published in THE PHILADELPHIA DAILY NEWS on February 21, 1996. This first article, entitled "Starting with Patronage: Board's Prez Calls for Major Cutbacks," outlined a speech given by the president of the Philadelphia School Board, Mr. Andrew N. Farnese. Therein, Farnese noted that the school district faced a budget deficit of $150 million, and outlined his proposals for saving the district money. A major component of Farnese's plan was to eliminate contracts with "politically connected people." Farnese stated, "The price of political patronage has become too high for our financially distressed district." Farnese also stated that he planned to introduce an ethics code for the Board of Education that would preclude board members from making money from district contracts. The newspaper mentioned three politically connected people who might be affected in this article by name, one of whom was Mr. Rush. The article also referenced Mr. Rush as having worked with former United States Representative William H. Gray.

¶ 8 The second article appeared in THE PHILADELPHIA DAILY NEWS on February 22, 1996. This article was entitled, "Goring Whose Ox? Fumo Friends & Foes Alike May Lose Out if Schools Actually Eliminate 'Patronage'." In this article, Mr. Rush is again identified as a "board member's husband who provides vending machines to schools," and is implied to be at risk of losing his contract because of his connection with former Congressman Gray and his being a former opponent of state Senator Vincent Fumo.

¶ 9 The Rushes argue that these articles are capable of a defamatory meaning because "[i]n a location such as Philadelphia, which has a long history of police, political and other kinds of corruption, the general public associates patronage with corruption, bribes and kick-backs, activities that reasonable people regard as criminal and immoral." Appellants' Brief at 9. After review, we conclude that this is not a reasonable interpretation of the articles at issue, and, in particular, the term, "patronage."

¶ 10 In reaching this result, we acknowledge that there are no reported cases in Pennsylvania which deal with the term "patronage" and its alleged defamatory meaning. Our research has disclosed, however, a remarkably similar case from the United States Supreme Court which we find instructive on this issue.

¶ 11 In *Greenbelt Coop. Publ'g Assn., Inc. v. Bresler,* 398 U.S. 6, 90 S.Ct. 1537,

26 L.Ed.2d 6 (1970), the Court considered a libel action instituted against the publishers of a local newspaper for allegedly libelous articles which reported that certain citizens had described Bresler's negotiating position at a city council meeting regarding a proposed zoning variance as "blackmail." Bresler had been trying to win the zoning variance for certain of his properties, and was also negotiating to sell another property to the city for use as a school building. Bresler and the city negotiated the sales of both properties concurrently, and the success of one negotiation necessarily implicated the success of the other. The negotiations were publicly conducted at several city council meetings, and several members of the public expressed displeasure at Bresler's bargaining tactics, some going as far as calling his tactics "blackmail." The newspaper reported on the negotiations, as well as the public response to Bresler's tactics.

¶ 12 Bresler filed an action against the newspaper, claiming that the use of the word "blackmail" in the articles necessarily implicated him in the commission of a crime and that, since the newspapers knew that Bresler had committed no such crime, they were liable for the knowing use of a falsehood. The lower courts upheld a jury verdict in Bresler's favor, but the United States Supreme Court reversed, finding that, as a matter of constitutional law, the word "blackmail" in these circumstances was neither libel nor slander because the word was incapable of being understood by the public under these circumstances as evidencing that Bresler had committed a crime.

¶ 13 First, the Court noted that the public debates in question were a subject of substantial concern for those living in the community. 398 U.S. at 13, 90 S.Ct. 1537. Further, the newspaper reports were accurate and complete. *Id.* The reports accurately and fully described Bresler's proposal, that some people at the meetings had made the "blackmail" reference, and that some other people at the

meeting supported Bresler. *Id.* at 14, 90 S.Ct. 1537. The Court stated:

It is simply impossible to believe that a reader who reached the word "blackmail" in either article would not have understood exactly what was meant: it was Bresler's public and wholly legal negotiating proposals that were being criticized. No reader could have thought that either the speakers at the meetings or the newspaper articles reporting their words were charging Bresler with the commission of a criminal offense. On the contrary, even the most careless reader must have perceived that the word was no more than rhetorical hyperbole, a vigorous epithet used by those who considered Bresler's negotiating position extremely unreasonable. Indeed, the record is completely devoid of evidence that anyone in the city of Greenbelt or anywhere else thought Bresler had been charged with a crime.

*Id.* at 14–15, 90 S.Ct. 1537 (footnote omitted).

¶ 14 Similarly in the present case, we hold that the use of the term "patronage" cannot imply to the reader that the Rushes were guilty of a criminal offense. The term "blackmail" in common usage has an even stronger implication of a crime than the word "patronage" which is defined as follows in The American Heritage Dictionary of the English Language, New College Edition (1981), at 961–62 (emphasis added):

pat•ron•age *n.* 1. Support, encouragement, or championship from a patron. 2. A patronizing manner. 3. The trade given to a commercial establishment by its customers. 4. Customers or patrons collectively; clientele. 5. *The power or action of distributing governmental or political positions* . 6. The positions so distributed.

We therefore conclude that this term, as used in this instance, is not capable of a defamatory meaning. *See Bresler, supra. See also Seropian v. Forman*, 652 So.2d 490, 496 (Fla.Dist.Ct.App.1995) (holding

that the use of the term "influence peddling" in a defamation action against a newspaper was not defamatory, but was mere "rhetorical hyperbole, a vigorous epithet"); *Suozzi v. Parente*, 202 A.D.2d 94, 616 N.Y.S.2d 355, 358 (1994) (holding that a newspaper article which suggested that Suozzi received "political favoritism" from his brother the mayor, but did not contain a clear assertion that a crime had been committed, was not defamatory and could not constitute libel *per se*). *Compare West v. Thomson Newspapers, et al.*, 872 P.2d 999, 1010 (Utah 1994) (holding that the accusation that West "manipulated" the press by trying to use his political position to influence information disseminated to the public was not defamatory: "[A]bsent assertions of illegal or at least ethically improper conduct, it is not defamatory to criticize a politician for using his or her office for personal gain.").

¶ 15 The Rushes next contend that the articles in question cast them in a false light. The tort of false light—invasion of privacy involves " 'publicity that unreasonably places the other in a false light before the public.' " *Strickland v. University of Scranton*, 700 A.2d 979, 987 (Pa.Super.1997) (quoting *Curran v. Children's Serv. Ctr. of Wyoming County, Inc.*, 396 Pa.Super. 29, 578 A.2d 8, 12 (1990)). A cause of action for invasion of privacy will be found where a major misrepresentation of a person's character, history, activities or beliefs is made that could reasonably be expected to cause a reasonable man to take serious offense. *Id.* "The elements to be proven are publicity, given to private facts, which would be highly offensive to a reasonable person and which are not of legitimate concern to the public." *Id.*

¶ 16 This cause of action must fail. Importantly, this is a matter of legitimate concern to the general public. The remarks in question were only made after it was announced that the Philadelphia School District had a deficit of $150 million. It cannot be gainsaid that the gener-

al public has an interest in and a right to know about their public school system. Accordingly, the court correctly granted summary judgment on the false light cause of action. *See Neish v. Beaver Newspapers, Inc.*, 398 Pa.Super. 588, 581 A.2d 619 (1990) (holding that several articles critical of a borough solicitor's performance as solicitor did not support a cause of action under false light—invasion of privacy as the publications, although containing statements which might be viewed as annoying or embarrassing, were not highly offensive to a reasonable person).

¶ 17 The Rushes argue that, even though the articles concern matters of public concern, their publication was accompanied by "unfair and unwarranted comment" such that their false light cause of action remains viable. After review, we simply do not agree that the articles contained such unfair and unwarranted comment regarding either Mr. or Mrs. Rush.

¶ 18 The Rushes also maintain that they may recover because the newspapers acted negligently when singling out the Rushes as beneficiaries of patronage contracts when no purpose was served by identifying them by name. There is no support for the proposition, however, that negligence may support a claim of false light—invasion of privacy. Rather, the person making the statement that is accused of rendering another in a false light must act with " 'knowledge of or . . . in reckless disregard as to the falsity of the publicized matter and the false light in which the other would be placed.' " *Larsen v. Philadelphia Newspapers, Inc.*, 375 Pa.Super. 66, 543 A.2d 1181, 1188 (1988) (quoting RESTATEMENT (SECOND) OF TORTS Section 652E). *See also Neish*, 581 A.2d at 624 (same). The Rushes have not produced any evidence that the newspaper either knowingly or recklessly published a falsehood. In fact the Rushes freely admitted in their depositions that they personally found nothing wrong with using political connections to advance their personal business. *See* Deposition of Harold

R. Rush, 4/14/98, at 138–41, Deposition of Dorothy Sumners Rush, 12/5/97, at 327–30; both attached as exhibits to Defendants' Motion for Summary Judgment, filed 8/3/98. Thus, the Rushes have not established a *prima facie* cause of action and the trial court correctly granted summary judgment to the newspapers.

¶ 19 The Rushes final issue on appeal is merely a reiteration of their previous issues. As we have found no merit to any of them, we will affirm the order that granted summary judgment in favor of the newspapers.

¶ 20 Order affirmed. Motion to dismiss the appeal denied.