Joan KRAJEWSKI, Appellant,

v.

Fred Paul GUSOFF, John Scanlon, Philly Online, LLC, Philadelphia Newspapers, LLC, dba Broad Street Community Newspapers, and Broad Street Publishing, LLC, Appellee.

Superior Court of Pennsylvania.

Argued April 10, 2012.

Filed Aug. 14, 2012.

Reargument Denied Oct. 22, 2012.

Barbara Axelrod, Philadelphia, for appellant.

Michael E. Baughman, Philadelphia, for appellee.

BEFORE: FORD ELLIOTT, P.J.E., BENDER, J., and COLVILLE, J.*

OPINION BY BENDER, J.

Joan Krajewski appeals the trial court's order granting preliminary objections in the nature of a demurrer and dismissing her claims of libel and false light invasion of privacy against defendants Fred Paul Gusoff; John Scanlon; Philly Online, LLC; Philadelphia Newspapers, LLC, doing business as Broad Street Community Newspapers; and Broad Street Publishing, LLC (collectively "the Newspapers"). Krajewski contends that the allegations of her complaint, if accepted as true, were legally sufficient to sustain her claims and that, consequently, the trial court erred in granting the demurrer. The trial court, the Honorable Patricia A. McInerney, concluded that the Complaint's averments failed to state claims of defamation as Krajewski, in her capacity as a public official, could not demonstrate that the information the Newspapers published was in fact false. We agree with the distinguished trial court concerning three of those claims for the reasons Judge McInerney explained in her opinion. We differ with the court's conclusions, however, in our disposition of Krajewski's libel claim concerning the Holmesburg Library and all of her claims of false light invasion of privacy. The court concluded that proof of a false light privacy claim mandates allegations and proof sufficient to show "falsity [and] actual malice," neither of which the court discerned in the articles the Newspapers published. Trial Court Opinion, 9/29/11, at 31. The court reasoned, in addition, that Krajewski's claims might be otherwise unsustainable as the matters the articles raised were of "legitimate concern to the public." *Id.* (citing *Rush v. Philadelphia Newspapers*, 732 A.2d 648, 654 (Pa.Su-

* Retired Senior Judge assigned to the Superior Court.

per.1999)). The court also recognized, however, that in view of apparent conflict in our decisional law defining the elements of false light invasion of privacy, "this issue is better left to the Superior Court." *Id.*

Upon review of the trial court's analysis of Krajewski's false light claims, we accept the court's invitation to clarify our jurisprudence defining false light invasion of privacy as a cause of action. Accordingly, we differentiate false light from other invasion of privacy claims, delineate the elements of false light as a cause of action, and consider the extent to which falsity must be demonstrated to substantiate a claim. To aid in our discussion, we recite the pertinent factual and procedural history of this case as ably chronicled in Judge McInerney's Rule 1925 Opinion:

[I]n this action Philadelphia City Councilwoman Joan Krajewski ("Councilwoman Krajewski" or "Plaintiff") asserted causes of action for defamation and false light invasion of privacy based on the contents of a series of editorials, columns, cartoons, and letters to the editor published in the *Northeast Times* which to varying degrees commented critically upon her enrollment in the City of Philadelphia's Deferred Retirement Option Plan ("DROP") and/or subsequent acceptance of a $274,587.13 DROP payment following a one-day retirement between terms on the Council of the City of Philadelphia ("City Council"). Pursuant to DROP, a City of Philadelphia ("City") employee who elects to participate may only continue to work for the City for a maximum of four years [after electing to participate in DROP]. (*See* Pl.'s Am. Compl. ("Compl.") ¶¶ 8–9). Thus, by enrolling in DROP, the employee makes a commitment to retire within the next four years. While the employee remains working, a monthly pension payment for that employee is credited to a tax-deferred, interest-bearing account. (Compl.¶ 9). The employee receives the balance of the payments and interest as a lump sum upon retirement. (Compl.¶ 10). The election to participate in DROP is irrevocable. (Compl.¶ 8).

In 2004, having served on City Council since 1979, and having been elected to a four-year term ending in early January 2008, Plaintiff enrolled in DROP and made the decision to retire. (*See* Compl. ¶¶ 5, 11, 19–21). Later, however, Plaintiff considered not retiring, but rather running for another four-year term on City Council. (*See* Compl. ¶¶ 11–12, 13, 15). Relatedly, at the time she was considering a bid for re-election, Plaintiff spoke with then Philadelphia City Solicitor, Romulo Diaz, Esquire, (The "City Solicitor") about withdrawing from DROP. (Compl.¶ 15). The City Solicitor informed her that she could not withdraw from DROP. (Compl.¶ 16). The City Solicitor, however, informed Plaintiff that if she won re-election, she could retire for one day at the conclusion of her existing term of office to fulfill the DROP requirement and then take the DROP payment and return for her new term of office. (Comp.¶ 16).

Around the time Plaintiff spoke with the City Solicitor, City Council President Anna Verna, in a request for advice, also sought the opinion of the City Solicitor regarding employment of City Council members who had or would enter DROP during their current terms of office and then win re-election. (*See* Compl. ¶¶ 16, 29, 31, 33). Consistent with what he told Plaintiff, the City Solicitor advised City Council President Verna in a letter that such City Council members could separate from City service and return no later than January 3, 2008 and be [formally] retired for at

least one working day, after which they could become rehired retirees upon being sworn in to their re-elected positions, and that would be in compliance with the Philadelphia Code. (*See* Compl. ¶¶ 16, 29, 31, 33).

In January of 2007, Plaintiff announced her intention to run for re-election. (Compl.¶¶ 19–20). Plaintiff subsequently ran and won the election for another four-year term on City Council, this one beginning in January 2008. (*See* Compl. ¶¶ 21, 33). Before beginning that term[,] Plaintiff retired for one day. (*See* Compl. ¶ 21). Shortly thereafter, Plaintiff received a DROP payment of $274,587.13 (*See* Compl. ¶¶ 21, 24). Currently, serving out this most recent term of office, Plaintiff remains a member of City Council. (*See* Compl. ¶¶ 5, 21).[1]

On December 18, 2009, the instant action was commenced by a writ of summons. The defendants named were: Fred Paul Gusoff; John Scanlon; Philly Online, LLC; Philadelphia Newspapers, LLC; and Broad Street Publishing, LLC ("Defendants"). Defendants are editors and publishers of the *Northeast Times,* a local Philadelphia newspaper. On March 10, 2010, the case was deferred due to the filing of a suggestion of bankruptcy for Philly Online, LLC; Philadelphia Newspapers, LLC; and Broad Street Publishing, LLC. While the case was deferred[,] Plaintiff filed a complaint against Defendants for defamation and false light invasion of privacy pursuant to a stipulation which allowed for the filing of the complaint. The case was removed from deferred status on April 4, 2011. On April 8, 2011, preliminary objections to the complaint were filed. On April 28, 2011, an amended complaint was filed.

In her amended complaint Plaintiff averred that in spite of the *Northeast Times'* endorsement of her on November 1, 2007, less than a month later Defendants "began their abuse of the Councilwoman in the Northeast Times. . . ." (Compl.¶ 21). According to Plaintiff, this abuse was Defendants' "systematic efforts to misrepresent the facts and manipulate their readers regarding the Councilwoman's DROP Payment [,]" which was exemplified by the following January 10, 2008 "plea" to their readers:

> Do as mayor what [Michael Nutter] couldn't do as councilman: Prohibit all elected officials from participating in the Deferred Retirement Option Plan. By the way, Councilwoman Joan Krajewski, who's collecting about $300,000 in retirement benefits even though she is not retiring, claims that she has not received a single call from citizens complaining about her acceptance of the bonanza. Readers, call Joan Krajewski's City Hall office and instruct her not to rip you off. **The phone number is 215–686–3444.**

> You're her boss, remember?

(*See* Compl. ¶¶ 21–25). According to Plaintiff,

> Defendants' "plea" falsely and/or with a reckless disregard for the truth implied that Councilwoman Krajewski could withdraw from participation in the DROP plan, despite [D]efendants' knowledge that the City of Philadelphia ordinance creating the DROP and the Philadelphia Board of Pensions and Retirement regulations implementing the DROP barred any employee who has enrolled in the DROP

1. With the expiration of her last term of office in January 2012, Councilwoman Krajewski has now retired from Philadelphia City Council.

from rescinding her enrollment, and the City's Personnel Department had so advised.

(Compl. ¶ 26).

In her amended complaint, Plaintiff complained about a number of other publications as well. For example, Plaintiff averred that:

On January 17, 2008, defendant Scanlon attacked Krajewski, and others, as "greedy politicians" and called the legal opinion supporting the DROP payments received by [City Commissioner] Tartaglione, Councilwoman Krajewski and other members of City Council the "Krajewski Clause," placing the Councilwoman in a false light with his malicious and reckless words, which falsely implied that Councilwoman Krajewski had requested a legal opinion that would permit her to remain in the DROP program without retiring and disregarded Councilwoman Krajewski's effort to withdraw from the DROP program and the known fact the City Solicitor's opinion was actually sought by Council President Verna.

(Compl. ¶ 29).

As another example Plaintiff averred that:

On December 18, 2008, the [D]efendants again maliciously attacked and defamed Councilwoman Krajewski, with knowledge of the falsity of their statement and/or reckless disregard for the truth, this time falsely claiming that the closing of the Holmesburg library was related to required receipt of her DROP pension almost a year earlier, falsely describing her lawfully-received DROP payments as "ill-gotten gains" and falsely implying that Councilwoman Krajewski had devised a scheme to "retire for one day just to collect [her] DROP money[.]"

(Comp. ¶ 32). There, the editorial provided:

Ladies and Gentlemen, boys and girls of Philadelphia, make no mistake: Holmesburg Library does not have to close on Dec[.] 31. The mayor can rescind his cease-and-desist order. He has the power to work with City Council to come up with a stopgap measure to keep it open. Whether that means shifting money around in the City's operating budget to keep the library open, finding emergency funding to preserve it for another 90 days, or sitting down with Councilwoman Joan "I'll retire for one day just to collect my DROP money" Krajewski to persuade her to donate her $300,000 of ill-gotten gains to save the library, he can do it.[2]

(Compl. ¶ 32).

---

2. Significantly, the Newspapers' editorial concerning the library closing appeared on the Opinion page on December 18, 2008, approximately eleven months after Krajewski had accepted her DROP payment. The column was amplified by a letter to the editor that appeared on the same page characterizing Krajewski's acceptance of the DROP payment as "stealing" from her constituents, as well as a political cartoon. The cartoon, which appeared at the top of the page and immediately to the right of the editorial, consisted of two frames, the first of which depicted Krajewski standing with Philadelphia mayor, Michael Nutter, in front of the Holmesburg Library branch. A "thought cloud" above their heads ascribed the mayor's sentiment as "Joan Krajewski and I would love to keep the Holmesburg Library open, but quite honestly, the funds are just not there." The second frame depicted a smiling Krajewski walking with Nutter away from the library branch, Krajewski bent backward under the apparent weight of an outsize bag labeled "DROP $", cinched at the top and dimpled with the imprints of protruding coins. A signpost in the background designating the "free" library branch is plastered over with a placard reading "closed."

Based on the above and a number of other publications, Plaintiff asserted causes of action for defamation and false light invasion of privacy against Defendants. (*See* Compl. pp. 2–20). In sum, Plaintiff averred that "[i]n spite of knowing the truth, the defendants embarked on a smear campaign continuing through at least March, 2010 that consisted of no less that 15 separate articles and two cartoons in which the defendants repeatedly and falsely accused Councilwoman Krajewski of being a thief, 'stealing' her [DROP] pension funds, defining her pensions funds as 'ill gotten gain,' and printing defamatory cartoons amplifying these sentiments." (Compl. p. 2).

On May 18, 2011, Defendants filed the instant preliminary objections. Therein Defendants argued that Plaintiff's defamation claim should be dismissed because Plaintiff complains exclusively about expressions of opinion, not about any allegedly false statements of defamatory fact, and cannot possibly prove that Defendants acted with actual malice. (Defs.' Prelim. Objections pp. 8–15).

Preliminarily, Defendants asserted that " '[a] simple expression of opinion based on disclosed or assumed non-defamatory facts is not itself sufficient for an action of defamation, no matter how unjustified and unreasonable the opinion may be or how derogatory it is.' " (Defs.' Prelim. Objections p. 9 (quoting *Mathias v. Carpenter* [402 Pa.Super. 358], 587 A.2d 1, 8–9 [3] (Pa.Super.Ct.1991))). Defendants stated [that] each of the publications at issue expresses an opinion "about the long-disclosed facts that [Councilwoman] Krajewski enrolled in DROP and committed to retire at the end of her seventh term as City Councilwoman; retired for one day at the end of that term; collected a DROP payment of almost $300,000; and returned

to office for an eighth term." (Defs.' Prelim. Objections p. 10).

Defendants then argued language such as "steal" and "ill-gotten gain" was "vituperative language used by the authors to describe their strongly held disagreement with [Plaintiff's] actions" and "[n]o reasonable reader ... would ever believe [Plaintiff] walked into the City treasury and held someone up at gunpoint or violated the law in any other way by accepting the DROP payment." (Defs.' Prelim. Objections p. 10). Rather, Defendants argued "[a]ny reasonable reader would recognize that the authors chose to use rhetorical hyperbole to convey the extent of their outrage about [Plaintiff's] acceptance of the lump-sum DROP 'retirement' payment despite retiring for just one day[,]" and that the law protects rhetorical hyperbole and vigorous epithets. (*See* Defs.' Prelim. Objections pp. 10–13).

Defendants also addressed a number of the allegedly false and defamatory facts that Plaintiff contended were implied in some of the publications. (*See* Defs.' Prelim. Objections p. 14–15). Addressing the fact that Plaintiff was not allowed to withdraw from DROP after choosing to enroll in it, Defendants argued "none of the publications at issue say anything to the contrary." (Defs.' Prelim. Objections p. 13). Addressing Plaintiff's assertion that certain publications implied that her acceptance of her DROP payment directly caused the closure of the Holmesburg Library, Defendants argued no reasonable reader would understand there to be such an implication. (Defs.' Prelim. Objections p. 14). And addressing Plaintiff's assertion that referring to the City Solicitor's formal opinion as the "Krajewski Clause" falsely implied that it was Plaintiff who requested the opinion rather

than City Council President Verna, Defendants argued any reasonable reader would recognize that the author labeled the opinion that way because it was Plaintiff who benefited from it and a "colorful rhetorical device to criticize her for doing so." (Defs.' Prelim. Objections p. 15).

Defendants also argued, in turn, that because Plaintiff did not identify any false statements or actual defamatory fact, she cannot possibly prove that Defendants acted with actual malice, which was required by law in this case as Plaintiff is a public official. (*See* Defs' Prelim. Objections pp. 15–17).

Lastly, Defendants contended that Plaintiff's false light claim should be dismissed for the same reasons as her defamation claim. (Defs.' Prelim. Objections p. 17). Moreover, citing *Rush v. Philadelphia Newspapers, Inc.*, 732 A.2d 648, 654 (Pa.Super.1999), Defendants argued the false light claim should be dismissed because Councilwoman Krajewski's participation in DROP was clearly a matter of public concern, and in Pennsylvania "a false light plaintiff must prove that the publication at issue [is] not about a matter of public concern." (Defs.' Prelim. Objections p. 17).

Trial Court Opinion, 9/29/11, at 2–8. Krajewski responded to the Newspapers' preliminary objections, in each instance posing alternative interpretations of the content of the respective articles ostensibly demonstrative of falsity and or false light. At oral argument, Krajewski's counsel amplified those responses, insisting that the Newspapers' editorials charged the plaintiff with "ripping off taxpayers" by accepting her scheduled DROP payment and "whipping up public sentiment against her" by suggesting that she had "robb[ed] from the city treasury[.]" N.T., Oral Argument, 6/30/11, at 29–30. Concerning the planned closing of the Holmesburg Library, counsel argued specifically that the Newspapers' editorial appeared to implicate Krajewski's acceptance of the DROP money as a contributing factor almost a full year after the sums in question had been paid:

I have also noticed that there's been no discussion of the editorials involving the closure of the Holmesburg Library. And I think perhaps they're even more striking examples of falsity. In that regard, the newspaper said, ladies and gentlemen, boys and girls of Philadelphia, make no mistake, the Holmesburg Library does not have to close on December 31st. And then they went through a list of possible ways to prevent the closure, such as the Mayor rescinding his cease and desist order, but then they get to the one involving the plaintiff. Or sitting down with Councilwoman Joan "I will retire for just one day just to collect my DROP money" Krajewski, to persuade her to donate her $300,000 ill gotten gain to save the library. [T]he clear implication is that [if] she had simply donated her DROP money that would have saved the Holmesburg Library, and it was being closed because of her.

*Id.* at 23–24. Predictably, the Newspapers argued to the contrary that "no reasonable reader is going to read a column [that way which] starts off, at least in the relevant portions, ladies and gentlemen, boys and girls of Philadelphia, make no mistake about it. It's obviously an opinion...." *Id.* at 37–38. Ultimately, Judge McInerney accepted the Newspapers' defenses on both claims and granted their demurrer with respect to both the defamation and false light claims. Krajewski has now appealed, raising the following questions for our consideration:

I. Did the trial court err in disregarding the false and defamatory implication of the [Newspapers'] published statements regarding Councilwoman Joan Krajewski, failing to apply the correct legal standards and sustaining the preliminary objections to her libel claims, where a fair reading of the [Newspapers'] statements creates at least a doubt that they carry the false and defamatory meaning she ascribes to them?

II. Did the trial court err in failing to consider the full meaning of the [Newspapers'] published statements regarding Councilwoman Joan Krajewski, the court's failure to give any weight to this Court's holding in *Larsen v. Phila. Newspapers, Inc.*, that a false light claim may arise from "public, as well as private, facts" and its reliance instead on a decision (*Rush v. Phila. Newspapers, Inc.*) which the trial court itself acknowledged appeared to erroneously import into a false light claim elements of the separate tort of publicity given to private life?

Brief for Appellant at 4.

 Our standard of review of a trial court's order granting preliminary objections in the nature of a demurrer is *de novo* and our scope of review is plenary. *Soto v. Nabisco, Inc.*, 32 A.3d 787, 789 (Pa.Super.2011). "The question presented by the demurrer is whether, on the facts averred, the law says with certainty that no recovery is possible. Where a doubt exists as to whether a demurrer should be sustained, this doubt should be resolved in favor of overruling it." *Id.* at 790.

A demurrer by a defendant admits all relevant facts sufficiently pleaded in the complaint and all inferences fairly deducible therefrom, but not conclusions of law or unjustified inferences. In ruling on a demurrer, the court may consider only such matters as arise out of the complaint itself; it cannot supply a fact missing in the complaint.

*Id.* (quoting *Butler v. Charles Powers Estate*, 29 A.3d 35, 38–39 (Pa.Super.2011)). Consequently, "preliminary objections should be sustained only if, assuming the averments of the complaint to be true, the plaintiff has failed to assert a legally cognizable cause of action." *Id.* at 789–90. "Where the complaint fails to set forth a valid cause of action, a preliminary objection in the nature of a demurrer is properly sustained." *Id.*

 In support of her first question, Krajewski asserts that the trial court erred in granting the Newspaper's demurrer to her claims of defamation in the form of libel.

In an action for defamation, the plaintiff must prove: (1) the defamatory character of the communication; (2) publication by the defendant; (3) its application to the plaintiff; (4) understanding by the recipient of its defamatory meaning; (5) understanding by the recipient of it as intended to be applied to plaintiff; (6) special harm to the plaintiff; (7) abuse of a conditionally privileged occasion. Initially, it is the function of the court to determine whether the communication complained of is capable of a defamatory meaning. A communication is defamatory if it tends to harm the reputation of another as to lower him in the estimation of the community or to deter third persons from associating or dealing with him. A communication is also defamatory if it ascribes to another conduct, character or a condition that would adversely affect his fitness for the proper conduct of his proper

business, trade or profession. If the court determines that the challenged publication is not capable of a defama- tory meaning, there is no basis for the matter to proceed to trial; *however, if there is an innocent interpretation and an alternate defamatory inter- pretation, the issue must proceed to the jury.*

*Maier v. Maretti,* 448 Pa.Super. 276, 671 A.2d 701, 704 (1995) (citations omitted). Further, when determining whether a communication is defamatory, the court will consider what effect the statement would have on the minds of the average persons among whom the statement would circulate. *Id.* "The words must be given by judges and juries the same significance that other people are likely to attribute to them." *Id.*

*Rush v. Philadelphia Newspapers, Inc.* 732 A.2d 648, 651–652 (Pa.Super.1999).

■ When raised by a public offi- cial concerning statements bearing on a matter of public concern, claims for defa- mation are subject to an onerous standard of proof, owing to considerations of free speech that inhere to any claim that impli- cates the First Amendment. *See Milko- vich v. Lorain Journal Co.,* 497 U.S. 1, 17, 110 S.Ct. 2695, 111 L.Ed.2d 1 (1990) (em- phasizing the obligation of appellate courts to ensure that judgments entered pursuant to state tort law do not intrude on the "field of free expression"). Consequently, our Courts' First Amendment jurispru- dence makes clear that "statements on matters of public concern must be prova- ble as false before there can be liability under state defamation law, at least in situations . . . where a media defendant is involved[.]" *Id.* at 19–20, 110 S.Ct. 2695 (citing *Philadelphia Newspapers, Inc. v.*

*Hepps,* 475 U.S. 767, 772, 106 S.Ct. 1558, 89 L.Ed.2d 783 (1986)). Moreover, even "a statement of opinion relating to matters of public concern that does not contain a provably false connotation will receive full constitutional protection." *Id.* (citing *Hepps, supra* ).

■ Applying the foregoing criteria, we conclude that the trial court correctly determined that the Northeast Times' arti- cles of January 10, 2008, January 17, 2008, and August 14, 2008, do not provide grounds for relief on Krajewski's claims of libel. All of the statements reflected mat- ters of opinion expressed in editorial state- ments, and neither reported nor implied facts that were "provably false," notwith- standing counsel's inventive argument to the contrary. Trial Court Opinion, 9/29/11, at 19 (quoting *Milkovich,* 497 U.S. at 20, 110 S.Ct. 2695). Moreover, consistent with the trial court's analysis, we do not find that any of the articles "contains a prov- ably false factual connotation" such as to exempt them from protection under the First Amendment. *See Milkovich,* 497 U.S. at 20, 110 S.Ct. 2695. Consequently, those three Newspapers' publications do not satisfy the high threshold of proof incumbent upon actions for defamation by a public figure against a media defendant.[3]

■ We reach a contrary conclusion, however, concerning the content of the Northeast Times "Opinion" page that ap- peared in the paper's December 8, 2008 edition. The coverage presents three sources of commentary on Krajewski's participation in the DROP program, visu- ally dominating the page. In the "Editori- al" column on the left of the page, the paper attempts to draw a cause and effect relationship between Krajewski's partic-

---

**3.** To the extent further discussion of those individual articles is appropriate for purposes of further appellate review, we adopt and

incorporate the well-crafted discussions ap- pearing in Judge McInerney's Rule 1925 Opinion on pages 16–23.

ipation in DROP and the closing of the Holmesburg Library. Significantly, the piece indicts Krajewski's acceptance of her pension payments from the DROP fund and suggests that they might be a source of funding for the library:

> Ladies and gentlemen, boys and girls of Philadelphia, make no mistake: Holmesburg Library does NOT have to close on Dec. 31. The mayor can rescind his cease-and-desist order. He has the power to work with City Council to come up with a stopgap measure to keep it open, finding emergency funding to preserve it for another 90 days, or sitting down with Councilwoman Joan "I'll retire for one day just to collect my DROP money" Krajewski to persuade her to donate her $300,000 ill-gotten gains to save the library; he can do it.

Attachment 4 to Brief for Appellant. Significantly, the editorial makes no mention of the fact that *Krajewski's DROP money consisted only of her own pension contributions* plus interest and that *the sum in question had been paid to her almost one year earlier.*

Adjacent to the editorial, occupying two-thirds of the top half of the page, a caricature amplifies the sentiments of the editorial, portraying Krajewski standing beside Philadelphia mayor Michael Nutter in front of the Thomas Holme Branch of the Philadelphia Free Library. *Id.* In a dialog box, the mayor remarks "Joan Krajewski and I would love to keep the Holmesburg Library open, but quite honestly, the funds are just not there." *Id.* In the adjoining frame, the caricature shows Krajewski and Nutter walking away from the library, Krajewski bent backward under the weight of giant bag of coins labeled "DROP $[,]" while the library signpost in the background reads "CLOSED." *Id.*

In the "Letters to the Editor" section, which appears immediately below the cari-

cature, the Newspaper ran a heading in large font asserting "DROP lets Council steal our money[.]" *Id.* The first letter under the heading expressed citizen outrage at what the writer described as "stealing through the DROP program." *Id.* The paper reprinted the letter as follows:

> It's a shame that City Councilwoman Joan Krajewski left early the night of Mayor Nutter's town hall meeting in Mayfair last week.
>
> If she stayed she would have heard the complaints about her and other City Council member stealing our money through the DROP program.
>
> Mayor Nutter's answer is that he is against the DROP program and is going to ask City Council to look into it and possibly remove it.
>
> That should be funny. The Council that he wants to change the DROP program is the same Council that is stealing our money to begin with. What a joke that will be.
>
> I cannot understand how people can vote for someone when they know that person is stealing from them.

*Id.*

■ We recognize, as did the trial court, that each of the foregoing components of the Northeast Times Opinion page are themselves expressions of opinion. Consequently, Krajewski's entitlement to relief is closely circumscribed: "[W]here a statement of 'opinion' on a matter of public concern reasonably implies false and defamatory facts regarding public figures or officials, those individuals must show that such statements were made with knowledge of their false implications or with reckless disregard of their truth." *Milkovich,* 497 U.S. at 20, 110 S.Ct. 2695. We *do* find significant indicia of falsity in the implication of the Northeast Times' state-

ments. Contrary to the Newspapers' assertions in this litigation, these pieces, when considered together in the context in which the paper's editors placed them, might suggest to the average reader that Krajewski acted to the detriment of her constituents in accepting a large payout of public funds that might otherwise have sustained a branch of the Philadelphia Free Library. In truth, the funds paid out, with the exception of interest paid on Krajewski's underlying contributions, were not public funds, but were a mandatory payout from Krajewski's pension. Hence, they were *her* money. Moreover, the funds had been paid almost one year before the publicized closing of the library, and thus, could not possibly be related to it.

We find these circumstances equally probative of defamatory meaning; the paper's act of resurrecting the controversy that surrounded the payment of Krajewski's DROP account so many month's prior was of little import to the closure of the Holmesburg Library and could only serve to tar Krajewski's reputation well after she had been elected to her final term on Council. Most probably, such allegations, when publicized in a paper of general circulation, would enflame public sentiment, implying that Krajewski valued her own interest above those of her constituents and was therefore unfit to hold public office. *See Rush*, 732 A.2d at 652 ("A communication is also defamatory if it ascribes to another conduct, character or a condition that would adversely affect his fitness for the proper conduct of his proper business, trade or profession.") Thus, to the extent that the scenario the Opinion page suggested is provably false, as we believe it may be, the underlying communication is defamatory even when subjected to the rigor of First Amendment standards. *Cf. MacElree v. Philadelphia Newspapers, Inc.*, 544 Pa. 117, 674 A.2d 1050, 1056 (1996) ("Indeed, because there is doubt as to the statement's precise import, and as to whether reasonable minds could understand the statement to constitute a charge of abuse of public office, i.e., that the District Attorney was persecuting [a black university] in order to curry favor with the voters by playing to the voters' supposed prejudice so as to advance his own political career, the demurrer should have been denied."). Accordingly, we conclude that the circumstances pled surrounding the Newspapers' Opinion page of December 8, 2008, are such that if proven at trial, they may establish a claim for libel, even in view of the high First Amendment threshold in play.

■ In support of her second question, Krajewski contends that the trial court erred in granting the Newspapers' demurrer to her claim of false light invasion of privacy. A cause of action for invasion of privacy is "actually comprised of four analytically distinct torts: 1) intrusion upon seclusion, 2) appropriation of name or likeness, 3) publicity given to private life, and 4) publicity placing a person in a false light." *Larsen v. Philadelphia Newspapers, Inc.*, 375 Pa.Super. 66, 543 A.2d 1181, 1188 (1988). The fourth of these, recognized in Pennsylvania as false light invasion of privacy, is defined by the Restatement (Second) of Torts, section 652E as follows:

**§ 652E. Publicity Placing Person In False Light**

■ One who gives publicity to a matter concerning another that places the other before the public in a false light is subject to liability to the other for invasion of his privacy, if

(a) the false light in which the other was placed would be highly offensive to a reasonable person, and

(b) the actor had knowledge of or acted in reckless disregard as to the falsity of the publicized matter and the false light in which the other would be placed.

RESTATEMENT (SECOND) TORTS, § 652E. In contradistinction to invasion of privacy for publicity given to private life, *see id.*, § 652D, false light does not require proof that the matter giving rise to the plaintiff's claim be restricted to one of private concern.[4] Indeed, "recovery in tort for disclosure of public, as well as private, facts, ... is warranted to protect a claimant's right to be free from being placed in a false light ... which may be caused by the discriminate publication of such facts." *Larsen,* 543 A.2d at 1189.

 Significantly, unlike the law of defamation, *see Milkovich,* 497 U.S. at 20, 110 S.Ct. 2695, false light invasion of privacy offers redress not merely for the publication of matters that are provably false, but also for those that, although true, are selectively publicized in a manner creating a false impression. *See Larsen,* 543 A.2d at 1189.

In many cases ... the publicity given to the plaintiff is defamatory, so that he would have an action for libel or slander.... In such [cases] the action for invasion of privacy will afford an alternative or additional remedy, and the plaintiff can proceed upon either theory, or both, although he can have but one recovery for a single instance of publicity.

It is not, however, necessary to the action for invasion of privacy that the plaintiff be defamed. It is enough that he is given unreasonable and highly objectionable publicity that attributes to him characteristics, conduct or beliefs that are false, and so is placed before the public in a false position. When this

---

4. As Judge McInerney recognized, this Court's prior cases have not always provided appropriate clarity in delineating the elements of false light invasion of privacy, and distinguishing them from the elements of publicity given to private life. False light, as defined by Restatement (Second) of Torts, section 652E, contemplates *no requirement* that the matters at issue "are not of legitimate concern to the public." Trial Court Opinion, 9/29/11, at 29 (quoting *Rush,* 732 A.2d 648, 654 (Pa.Super.1999)). Nevertheless, in *Rush,* we imported "lack of legitimate public concern" as an element of false light, apparently in reliance on *dicta* from our own prior decision in *Strickland v. University of Scranton,* 700 A.2d 979, 987 (Pa.Super.1997). *Strickland,* in turn, extracted the terminology from our decision in *Harris v. Easton Publishing Co.,* 335 Pa.Super. 141, 483 A.2d 1377, 1387 (1984). Significantly, the Court in *Harris* confined its consideration to the plaintiff's claims of Intrusion Upon Seclusion and Publicity Given to Private Life, as defined by Restatement (Second) of Torts, sections 652B and 652D, respectively. The Court *did not* address a claim of false light pursuant to section 652E. Although, in *Strickland,* we considered claims pursuant to both sections 652D

and 652E, our reliance on *Harris* applied only to the definition of section 652D claims, rather than those made under Restatement section 652E. A cause of action for false light invasion of privacy under section 652E does not require proof that the matter in issue was "not of legitimate concern to the public." *See Larsen,* 543 A.2d at 1189. Although we have considered the extent of public concern with the facts disclosed *as a policy consideration* bearing on a media defendant's entitlement to summary judgment on a claim of false light, we have never properly recognized it as an element of the tort. *See Neish v. Beaver Newspapers, Inc.,* 398 Pa.Super. 588, 581 A.2d 619, 624–25 (*citing Harris, supra* ) ("Additionally, the Appellant's stature in the community as a public figure resulted in a relinquishment of insulation from scrutiny of his public affairs."). Consequently, the extent to which the matters at issue are "of legitimate concern to the public" is not properly considered on preliminary objections in the nature of a demurrer. In this writing, we expressly disavow any suggestion that a lack of "legitimate public concern" should be an element of a section 652E claim for false light invasion of privacy. *See Larsen, supra.*

is the case and the matter attributed to the plaintiff is not defamatory, the rule here stated affords a different remedy, not available in an action for defamation.

RESTATEMENT (SECOND) TORTS § 652E Cmt. b (Relation to defamation.).

Consistent with this standard,

a false light claim can be established where true information is released if the information tends to imply falsehoods. *Id.* "Literal accuracy of separate statements will not render a communication 'true' where the implication of the communication as a whole was false." *Id.* (citing *Dunlap v. Philadelphia Newspapers, Inc.*, 301 Pa.Super. 475, 448 A.2d 6, 15 (1982)). In order to prevail on this theory of false light invasion of privacy, appellant must show discriminate publication of true statements, that is, appellees must have *created* a false impression by knowingly or recklessly publicizing selective pieces of true information. The question is whether appellees made "discrete presentation[s] of information in a fashion which render[ed] the publication susceptible to inferences casting [appellant] in a false light. . . ." *Id.*

*Santillo v. Reedel*, 430 Pa.Super. 290, 634 A.2d 264, 267 (1993). Whether the requisite "false light" is cast depends on the manner in which the information conveyed would prompt the public to perceive the aggrieved individual:

The rule stated in this Section applies only when the publicity given to the plaintiff has placed him in a false light before the public, of a kind that would be highly offensive to a reasonable person. In other words, it applies only when the defendant knows that the plaintiff, as a reasonable man, would be justified in the eyes of the community in feeling seriously offended and aggrieved by the publicity. Complete and perfect

accuracy in published reports concerning any individual is seldom attainable by any reasonable effort, and most minor errors, such as a wrong address for his home, or a mistake in the date when he entered his employment or similar unimportant details of his career, would not in the absence of special circumstances give any serious offense to a reasonable person. . . . It is only when there is such a major misrepresentation of his character, history, activities or beliefs that serious offense may reasonably be expected to be taken by a reasonable man in his position, that there is a cause of action for invasion of privacy.

RESTATEMENT (SECOND) TORTS § 652E Cmt. c (Highly offensive to a reasonable person).

 Upon consideration of Krajewski's Complaint, in view of the elements of Restatement (Second) section 652E, we are constrained to conclude that the trial court erred in granting the Newspapers' demurrer to Plaintiffs claims of false light as they concern the closing of the Holmesburg Library. In so concluding, we acknowledge the constitutional imperative that "in cases raising First Amendment issues . . . an appellate court has an obligation to 'make an independent examination of the whole record' in order to make sure that 'the judgment does not constitute a forbidden intrusion on the field of free expression.'" *Milkovich*, 497 U.S. at 17, 110 S.Ct. 2695 (quoting *Bose Corp. v. Consumers Union of United States, Inc.*, 466 U.S. 485, 499, 104 S.Ct. 1949, 80 L.Ed.2d 502 (1984)). This measure of caution has counseled the United States Supreme Court to extend First Amendment protections to speech uttered in violation of a plaintiff's state privacy rights. *See Time, Inc. v. Hill*, 385 U.S. 374, 389, 87 S.Ct. 534, 17 L.Ed.2d 456 (1967) (extending actual malice standard—requiring that "the de-

fendant acted with knowledge of the falsity of the statement or in reckless disregard as to truth or falsity"—to claim of false light invasion of privacy under state statute). *See also Snyder v. Phelps*, —— U.S. ——, 131 S.Ct. 1207, 1219–1220, 179 L.Ed.2d 172 (U.S.2011) (declining to enforce verdict in favor of plaintiff for invasion of privacy by intrusion upon seclusion, noting "[t]he ability of government, consonant with the Constitution, to shut off discourse solely to protect others from hearing it is ... dependent upon a showing that substantial privacy interests are being invaded in an essentially intolerable manner.").[5] Yet we recognize as well that "constitutional guarantees can tolerate sanctions against calculated falsehood without significant impairment of their essential function." *Hill*, 385 U.S. at 389–390, 87 S.Ct. 534. Indeed, First Amendment protections must function in balance with competing interests protected by state tort law, among which the sanctity of reputation and the right to privacy are

seminal to our jurisprudence. *See Milkovich*, 497 U.S. at 22, 110 S.Ct. 2695 ("The right of a man to the protection of his own reputation from unjustified invasion and wrongful hurt reflects no more than our basic concept of the essential dignity and worth of every human being-a concept at the root of any decent system of ordered liberty."). Ultimately, should the finder of fact determine that the overall impression created by the Newspapers' statements was itself a "calculated falsehood" pursuant to Restatement section 652E, (notwithstanding the literal truthfulness of individual statements), they would be entitled to no constitutional protection.

Although honest utterance, even if inaccurate, may further the fruitful exercise of the right of free speech, it does not follow that the lie, knowingly and deliberately published * * * should enjoy a like immunity. * * * For the use of the known lie as a tool is at once at odds with the premises of democratic govern-

---

**5.** In both the *Hill* and *Snyder* cases, the Supreme Court offered its holding with extraordinary care and introspection, limiting its reach in express recognition of the burden it might impose on interests protected by state tort law. In *Hill*, the Court limited its holding as follows:

> We find applicable here the standard of knowing or reckless falsehood, not through blind application of *New York Times Co. v. Sullivan*, relating solely to libel actions by public officials, but only upon consideration of the factors which arise in the particular context of the application of the New York statute in cases involving private individuals. This is neither a libel action by a private individual nor a statutory action by a public official. Therefore, although the First Amendment principles pronounced in *New York Times* guide our conclusion, we reach that conclusion only by applying these principles in this discrete context.

*Hill*, 385 U.S. at 390–91, 87 S.Ct. 534. Similarly in *Snyder*, the high Court circumscribed its ruling, limiting its effect to the parameters of that case:

> Our holding today is narrow. We are required in First Amendment cases to carefully review the record, and the reach of our opinion here is limited by the particular facts before us. As we have noted, "the sensitivity and significance of the interests presented in clashes between First Amendment and [state law] rights counsel relying on limited principles that sweep no more broadly than the appropriate context of the instant case." *Florida Star v. B.J.F.*, 491 U.S. 524, 533, 109 S.Ct. 2603, 105 L.Ed.2d 443 (1989).

*Snyder v. Phelps*, —— U.S. ——, ——, 131 S.Ct. 1207, 1220, 179 L.Ed.2d 172 (2011). Thus, while we remain mindful of the principles each case enunciates, we do not view either as dispositive of our analysis of the unique facts of this case. We note as well that, as concerns the tort of false light, it appears that in defining the contours of Restatement section 652E, the American Law Institute has incorporated the constitutional floor suggested by the decision in *Hill*. *See* RESTATEMENT (SECOND) TORTS § 652E Cmt. D (Constitutional restrictions on action.).

ment and with the orderly manner in which economic, social, or political change is to be effected. Calculated falsehood falls into that class of utterances which 'are no essential part of any exposition of ideas, and are of such slight social value as a step to truth that any benefit that may be derived from them is clearly outweighed by the social interest in order and morality. * * *' *Chaplinsky v. State of New Hampshire,* 315 U.S. 568, 572, 62 S.Ct. 766, 769, 86 L.Ed. 1031. Hence the knowingly false statement and the false statement made with reckless disregard of the truth, do not enjoy constitutional protection.'

*Hill,* 385 U.S. at 389–390, 87 S.Ct. 534 (quoting *Garrison v. State of Louisiana,* 379 U.S. 64, 75, 85 S.Ct. 209, 13 L.Ed.2d 125 (1964)). We find *Hill*'s application of these principles to claims of false light invasion of privacy particularly instructive, as it limits the reach of First Amendment protections without requiring, as in the case of defamation, that individual statements be proven false. We find this limitation entirely consonant with the circumspection due the interests of privacy and reputation protected by state law torts like invasion of privacy. Arguably, the "calculation" necessary to imply falsity through the use of what may be otherwise true statements counsels a limitation of the protection to which the resulting portrayal is subject. True statements should speak for themselves, subject only to the critical analysis and judgment of the reader, and devoid of the deliberate confabulation at which the state law cause of action for false light is directed.

■ The trial court concluded, in the first instance, that the extension of First Amendment protections effectively undermines Krajewski's false light claims, as she could not prove falsity and actual malice. Trial Court Opinion, 9/29/11, at 27 (citing *Snyder, supra*). We disagree. Proof of false light does not devolve on evidence that every single statement is itself false, but rather that the scenario depicted created a false impression, even if derived from true statements. As our discussion of Krajewski's related defamation claim elucidates, significant indicia of falsity is apparent in the Northeast Times' treatment of the Holmesburg Library closing, suggesting a causal relationship the paper could not document, and an obligation by Krajewski to disgorge a meal from the public trough that, arguably, she had not consumed. Naturally, such suggestions would tend to cast her in a false light. We have little doubt that a significant number of readers would infer that Krajewski and others like her were systematically pilfering the public purse, accessing money that did not belong to them. That impression is rendered more virulent by the obvious linkage the paper's content draws between the Krajewski's participation in the DROP program and the closing of the Holmesburg Library. At very least, the page appears to suggest that Krajewski could have stopped the closing of the library had she chosen to do so and that, instead, she elected to "take the money and run." [6]

---

**6.** We pause to emphasize that, in the context of the false light claims before us, the law appears to counsel, if not compel, our consideration of the Northeast Times Opinion page in its entirety, to gauge the potential effect of its content upon readers. To the extent that the three pieces in question appear on the page together and address Joan Krajewski's participation in the DROP program in relation with the closing of the Holmesburg Library, they orchestrate a perception that each of them, considered in isolation, might not. Because the readers of the Northeast Times would not receive or view any of the pieces in that manner, neither may we.

At this procedural juncture, we cannot be certain whether it was the Newspapers' intent to foster these impressions, nor can we gauge the extent to which the editors acted with reckless disregard for the truth. Such certainty is not consonant with the judicial role at this point in the litigation. *Cf. MacElree*, 674 A.2d at 1056 (Cappy, J., concurring). Nevertheless, to the extent the editorial staff of the Northeast Times may have orchestrated the Opinion page to create arguably false impressions, we find the implication of actual malice at least sufficient to survive preliminary objections in the nature of a demurrer. The factfinder could conclude, quite reasonably, that Northeast Times staff exploited the closure of the Holmesburg Library, conflating Mayor Nutter's controversial budgetary decision with true information concerning Krajewski's participation in the DROP program, and spawning an embellished and false story. Of course, we remain cognizant that more limited interpretations of the paper's content may be viable as well, reflecting perhaps the proclivity of individual readers to perceive differently, assertions of fact and the inferences they suggest. Yet the Newspapers marketed the Northeast Times to all members of the public, not all of whom need to share the same perception to justify Krajewski's false light claim. Moreover, we conclude that the extent to which the public perceived Joan Krajewski in a false light based on the Newspaper's portrayals raises questions of fact well beyond a court's ability to determine on preliminary objections. *Cf. MacElree*, 674 A.2d at 1056 (Cappy, J., concurring).

As concerns Krajewski's claims of false light arising out of the Newspapers' publications of January 10, 2008, January 17, 2008, and August 14, 2008, we note that the trial court premised its ruling on the standard stated by this Court in *Rush, supra*. As explained in footnote 4 above, Restatement (Second) of Torts, section 652E, contemplates *no requirement* that the matters at issue "are not of legitimate concern to the public." Trial Court Opinion, 9/29/11, at 29 (quoting *Rush*, 732 A.2d 648, 654 (Pa.Super.1999)). Accordingly, we find it necessary to vacate the trial court's order as it applies to the false light claims on each of the foregoing articles and remand for discovery consistent with our discussion concerning the Holmesburg Library.

For the foregoing reasons, we affirm the trial court's order to the extent that it dismisses Krajewski's claims of defamation for the publications of January 10, 2008, January 17, 2008, and August 14, 2008. We vacate the court's order as it applies to the claim of defamation arising from the Holmesburg Library coverage of December 8, 2008, as well as Kajewski's claims of false light.

Order **AFFIRMED** in part, **VACATED** in part. Case **REMANDED** for further proceedings consistent with this Opinion. Jurisdiction **RELINQUISHED**.